[Civ. No. 19258. Fourth Dist., Div. Two. Jan. 19, 1979.]

WALTER R. MARTIN, Plaintiff and Appellant, v.
BRUCE A. JOHNSON et al., Defendants and Respondents.

596

## COUNSEL

Jacque Boyle for Plaintiff and Appellant.

Daniel R. Bucknum, Kirton, McConkie, Boyer & Boyle, Dan S. Bushnell, Garrett & Dimino and Kenneth R. Garrett for Defendants and Respondents.

## OPINION

## McDANIEL, J.—

### INTRODUCTION

Walter R. Martin (plaintiff) brought suit against Bruce A. Johnson (defendant Johnson) and The Church of Jesus Christ of Latterday Saints (defendant church, also referred to as L.D.S. Church).[1] Plaintiff charged that defendants had committed the torts of defamation, intentional infliction of emotional distress, interference with prospective advantage and conspiracy to commit those torts. After the action was at issue, the trial court granted defendants' motion for summary judgment made pursuant to Code of Civil Procedure section 437c.[2] Thereafter, plaintiff made two motions, one to set aside defendant's summary judgment pursuant to section 473,[3] and the other for a new trial. The trial court denied both motions. Plaintiff appealed "from the denial of Plaintiff's Motion to Set Aside Summary Judgment and the Motion . . . for a New Trial . . . ."

### STATEMENT OF FACTS

Plaintiff is an ordained minister in the Southern Baptist Convention. He currently teaches the subject of comparative religion at Melodyland School of Theology at Anaheim, California.

Since the early 1950's, plaintiff has written a number of provocative books, articles and pamphlets and has recorded tapes on the subject he calls the Cult of Mormonism. Those writings include: "The Rise of the Cults" (1955); "Mormonism" (1957), a pamphlet; "The Maze of Mor-

---

[1]Plaintiff named as additional church defendants, "The First Presidency; Corporation of the President; The Corporation of the Presiding Bishop; California Anaheim Mission; Santa Ana Institute of Religion; Fountain Valley First Ward; Costa Mesa First Ward; Newport Beach Stake; Irvine Institute of Religion; and Costa Mesa Institute of Religion."

[2]All statutory references hereafter are to the Code of Civil Procedure, unless otherwise noted.

Section 437c reads in part: "Any party may move for summary judgment . . . if it is contended that the action has no merit or that there is no defense thereto. . . . Such motion shall be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

[3]Section 473 reads in part: "The court may, upon such terms as may be just, relieve a party or his legal representative from a judgment, . . . taken against him through his mistake, inadvertence, surprise or excusable neglect."

monism" (1962); a chapter on Mormonism in his book entitled "The Kingdom of the Cults" (1965); a tape entitled "Mormonism Yesterday and Today"; and articles in "Eternity Magazine" concerning Mormonism. Plaintiff has also delivered numerous lectures on this theme. In addition to his writings on his views of Mormonism, plaintiff has authored books and pamphlets on other religions which he characterizes as occultic and has conducted a radio program entitled the "Bible Answer Man" in Orange County, California.

Plaintiff's action here stems from public criticism by defendant Johnson directed at the integrity of plaintiff's research and the validity of plaintiff's opinions on the Mormon religion. Defendant Johnson apparently first had contact with plaintiff on November 1, 1972, on the occasion of a lecture by plaintiff at the Calvary Chapel in Costa Mesa, California. After plaintiff's lecture, defendant Johnson talked with plaintiff about plaintiff's theories. Plaintiff did not allege that any of his claimed grievances occurred during the November 1, 1972, discussion.

After that meeting, defendant Johnson read plaintiff's pamphlet entitled "Mormonism." The record and exhibits before us indicate that in that pamphlet plaintiff had aggressively criticized the Mormon religion. For example, plaintiff stated that "Mormons are polythesists and anti-Trinitarians masquerading under Christian terminology in a clever attempt to appear as 'angels of light' when in reality they are . . . 'ministers of Satan.' . . . In the final analysis . . . Mormonism . . . is, a cleverly designed counterfeit of the Christian religion, . . . [U]nderneath the filmy coat of pseudo-Christian all Mormons adhere tenaciously to the anti-Christian dogmas of Joseph Smith and Brigham Young."

Primarily in response to plaintiff's critical opinions in "Mormonism" and secondarily in response to the first discussion he had had with plaintiff on November 1, 1972, defendant Johnson authored a pamphlet entitled "A Mormon Answers." Plaintiff in part bases his action against defendants on the critical comments of plaintiff articulated by defendant Johnson in "A Mormon Answers." As appears in the record, that criticism included the following comments by defendant Johnson about plaintiff:

1. "One would be forced to question if Mr. Martin actually used the sources listed."

2. "His (plaintiff's) work is a travesty on scholarship."

3. "Plaintiff's writings contain . . . factually gross violations of what they taught, Joseph Smith and Brigham Young."

4. "Mr. Martin continues his misrepresentations."

5. "Did Satan tell an out-and-out lie? No, he told a half truth. That is what Mr. Martin does . . . ."

6. "If Mr. Martin wishes to be honest . . . ."

7. "Most anti-Mormon writers begin in much the same fashion as Mr. Martin, that of character assassination."

Plaintiff further bases his action on public statements made by defendant Johnson on June 4, 1974, at the Westminster Presbyterian Church, Westminster, California. Defendant Johnson had engaged in a debate with plaintiff during the question-and-answer period following plaintiff's lecture at that church. The record indicates that defendant Johnson made the following comments:

"(a) I stand here tonight and I'm prepared with evidence and I charge you of deception and of fraud in your representation of what Mormons teach and what Brigham and Joseph said;

"(b) One further example of the fraud you represent;

"(c) Misrepresenting grossly;

"(d) You spent 24 years of your life deceiving[.]"

The record further indicates that during the heated exchange between plaintiff and defendant Johnson at the time and place noted, plaintiff made the following statements:

"1. I have no respect for the Mormon Church, nor for Joseph Smith and Brigham Young, because I believe as Orson Pratt has said that they have been deceived and that their theology is contrary to biblical revelation . . . .

"2. If we are going to ever reach Mormonism, it will be by telling them the truth, as it is in Jesus, and by pointing out to them that though we hate the theology of the Mormon Church because it is evil, we love them because Jesus Christ did and died for their sins.

"3. If they are condemned, (i.e. Mormons) they are condemned by Holy Scripture, because they have listened to false prophets who have made merchandise of them with feigned words . . . .

"My heart goes out to the sincere and the earnest, and the dedicated Mormon, who has really believed Joseph (Smith) and Brigham (Young). You have believed a lie. . . ."

At the time defendant Johnson authored "A Mormon Answers," near the end of 1972, he was a member and elder in the Priesthood of the L.D.S. Church. To hold such position, a male member must be 18 years of age or older. At the time of the verbal exchange between plaintiff and defendant Johnson in June 1974, Johnson lived in the L.D.S. Church geographical area called Fountain Valley First Ward and maintained his elder position there. Because of defendant Johnson's association with the L.D.S. Church as described, plaintiff named that church and its subsidiary groups as defendants. Plaintiff's alleged right to recovery against the church defendants is on a theory of vicarious liability based on respondeat superior.

Beyond the key procedural issues framed by the appeal, the record suggests several interesting issues relating to the merits of the action as filed. For example, is plaintiff a public figure within the framework of *Gertz* v. *Robert Welch, Inc.* 418 U.S. 323 [41 L.Ed.2d 789, 94 S.Ct. 2997], and if so, does the *New York Times Co.* v. *Sullivan,* 376 U.S. 254 [11 L.Ed.2d 686, 84 S.Ct. 710, 95 A.L.R.2d 1412] "actual malice" test apply when a defendant is not media related? (See, e.g., Shiffrin, *Defamatory Non-Media Speech and First Amendment Methodology* (1978) 25 UCLA L.Rev. 915.) However, because of the procedural posture of this case, we are precluded from addressing those issues directly in disposing of the appeal.

Plaintiff's notice of appeal expressly states that he is appealing "from the denial of [his] Motion to Set Aside Summary Judgment and [his] Motion . . . for a New Trial." Defendants contend that plaintiff's appeal should be dismissed because he has appealed from nonappealable orders. Defendants first assert that "well settled authority in California forbids an appeal from a denial of a motion to set aside a previous judgment. . . ." Secondly, defendants urge that "[i]t is unquestioned appellate procedure that a *denial* of a Motion for a New Trial is nonappealable."

As we shall explain below, defendants are correct in their assertion that plaintiff's appeal from the trial court's denial of his motion for a new trial must be disregarded because such an order is nonappealable. ▆▆ On the other hand, defendants' contention that plaintiff's appeal from the trial court's order denying his section 473 motion is similarly nonappealable is incorrect. Such an order after judgment is clearly appealable. (§ 904.1, subd. (b).) ▆▆ Thus, the key issue before us is whether the trial court abused its discretion in denying plaintiff's section 473 motion. Our conclusion is that it did not.

## I

During the hearing on the earlier motion for summary judgment made by defendants they argued that plaintiff's affidavits in opposition were legally defective because they contained hearsay and were not based on the declarants' personal knowledge. Hence, according to defendants, they failed to conform to the requirements in section 437c governing declarations and affidavits filed in opposition to a motion for summary judgment. "Supporting and opposing affidavits or declarations shall be made by any person on *personal knowledge,* shall set forth *admissible evidence,* and shall show affirmatively that the affiant is competent to testify to the matters stated therein." (§ 437c, italics added.)

Because of the defects noted, the trial court granted defendants' motion to strike certain paragraphs of plaintiff's declaration and exhibits submitted by him. In doing so, the court stated, "Gentlemen, the motion to strike Paragraphs five, six, ten and eleven and all of the exhibits to the declaration of Walter Martin is granted on the ground that same contains, is offered for the truth of what was said and that it's hearsay and it does not appear to the Court to come within any of the exceptions to the hearsay rule."

The paragraphs and exhibits stricken deal essentially with information plaintiff sought to introduce in connection with proving vicarious liability and conspiracy claims against the L.D.S. Church. For example, paragraph 5 of plaintiff's declaration, stricken by the court, reads:

"5. During the course of this litigation, I had a meeting with Marilyn Johnson, wife of defendant Bruce Johnson, at Garden Grove, California. During that meeting I asked Marilyn Johnson various questions to which she responded. A tape was taken of the conversations which occurred at that meeting, a transcript of which is attached hereto as Exhibit B. From

the conversation, it became apparent that the accusations made by Bruce Johnson on June 4, 1974 and those contained in his publication 'A Mormon Answers' were maliciously made as part of a conspiracy by and with the knowledge, authorization, consent and subsequent ratification of various [church] defendants and their officers and agents."

After the trial court awarded defendants their summary judgment, plaintiff noticed a motion to set aside that judgment pursuant to section 473.[4] In support of his motion, plaintiff asserted "[t]hat [his] attorney inadvertently and mistakenly filed affidavits that were not within the personal knowledge of plaintiff." Plaintiff's attorney's declaration in support of the section 473 motion offered the following "excuse" for the submission of plaintiff's defective declaration and exhibits at the time of the summary judgment motion: ". . . it was our office's decision that due to the lateness of time in filing our opposition papers and not wanting again to have to obtain a continuance, and believing that the affidavits were sufficient to allow plaintiff to state what other persons had told him personally, to attach said affidavits to our opposition papers."

## II

Turning to the several questions imported by the foregoing California law in this area is well settled and holds that a denial of a motion to set aside a previous judgment is generally not appealable. (See, e.g., *Southern Pac. R. R. Co.* v. *Willett,* 216 Cal. 387 [14 P.2d 526].) The policy underlying preclusion of an appeal from a motion to set aside a judgment has been articulated by the California Supreme Court in *Spellens* v. *Spellens,* 49 Cal.2d 210 [317 P.2d 613]: "This proposition stems from the rule that forbids a party to do indirectly what he may not do directly. Even where there is a right of appeal from a judgment or order, a party cannot ordinarily take an appeal from a subsequent order denying a motion to vacate the judgment or order complained of, under such circumstances that the motion merely calls upon the court to repeat or overrule the former ruling on the same facts. . . . The party aggrieved by a judgment or order must take his appeal from such judgment or order itself, if an appeal therefrom is authorized by statute, and not from a subsequent order refusing to set it aside." (*Id.,* at p. 228.)

Exceptions to that rule do exist, however. In *Daley* v. *County of Butte,* 227 Cal.App.2d 380 [38 Cal.Rptr. 693], the court recognized that while a party might correctly have appealed from a default judgment, "the record

---

[4]See footnote 3 *ante.*

on appeal would not have reflected [that party's] side of the story. Under these circumstances, where a direct appeal from the dismissal is relatively ineffectual, the order refusing to vacate the dismissal is appealable. [Citations.]" (*Id.,* at p. 389.)

Further, in *Spellens* v. *Spellens, supra,* 49 Cal.2d 210, the Supreme Court recognized that "an appeal may be taken from an order denying [a motion to vacate] where the judgment has been obtained through mistake, inadvertence, surprise, or excusable neglect." (*Id.,* at p. 229.) In that case the court permitted a party's appeal from an order denying a motion to set aside the judgment because a mistake of fact had existed when the trial court made its order. (*Id.*)

More precisely, "[i]n . . . cases *where the law makes express provision for a motion to vacate* [original italics]—as under section 473, . . .—*an order denying such motion is regarded as a 'special order made after final judgment' and as such is appealable* [italics added] . . . ." (*Winslow* v. *Harold G. Ferguson Corp.,* 25 Cal.2d 274, 282 [153 P.2d 714]; see, e.g., *Sanford* v. *Smith,* 11 Cal.App.3d 991, 998 [90 Cal.Rptr. 256]; *Palmese* v. *Superior Court,* 193 Cal.App.2d 600, 602 [14 Cal.Rptr. 453]; *In re Marriage of Simmons,* 49 Cal.App.3d 833, 835-836 [123 Cal.Rptr. 213].)

Our principal inquiry, therefore, it appearing that the order denying the section 473 motion is appealable, is to determine whether plaintiff presented any facts showing that he was entitled to relief under section 473, and more exactly whether the trial court abused its discretion in denying plaintiff's motion made pursuant to that section.

It is axiomatic that a motion for relief under section 473 is addressed to the sound discretion of the trial court. The exercise of that discretion will not be disturbed on appeal absent a clear showing of abuse. More importantly, the discretion to be exercised is that of the trial court, not that of the reviewing court. Thus, even if the reviewing court might have ruled otherwise in the first instance, the trial court's order will yet not be reversed unless, as a matter of law, it is not supported by the record. (*Coyne* v. *Krempels,* 36 Cal.2d 257, 263 [223 P.2d 244].)

Additionally, we note that the law favors trials on the merits and courts are loath to penalize a litigant for the omission of counsel, particularly when the litigant has acted promptly, and has relied upon the attorney to protect his rights. (*Martin* v. *Cook,* 68 Cal.App.3d 799, 809 [137 Cal.Rptr. 434].) Nevertheless, to obtain relief under section 473,

plaintiff must demonstrate that the mistake or neglect on the part of counsel was *excusable. (Id.)*

In *Martin* v. *Cook, supra,* 68 Cal.App.3d 799, the court reversed a trial court's grant of a plaintiff's section 473 motion. In that case the defendant moved to dismiss because of the plaintiff's failure to bring the case to trial within five years, pursuant to section 583, subdivision (b). That motion was granted. Plaintiff then moved to set aside the dismissal pursuant to section 473, arguing that his failure to comply with section 583 was because of inadvertence and mistake. The trial court granted plaintiff's section 473 motion, the case then went to trial, and the plaintiff recovered a $100,000 verdict.

On appeal, the court reversed, holding that the trial court had abused its discretion in granting plaintiff's section 473 motion because "counsel for plaintiff's explanation of his delay when considered in the light of the record . . . demonstrates a lack of activity . . . [and] indicates a failure to discharge the duty devolving upon every person who files an action on behalf of his client, to prosecute it with reasonable promptness and diligence." (*Id.,* at p. 808.)

In *Martin,* plaintiff's counsel signed a stipulation waiving the provisions of section 583, subdivision (a), the two-year statute. He erroneously thought, however, that the stipulation had likewise waived the five-year provision in section 583, subdivision (b). In a declaration supporting plaintiff's section 473 motion, plaintiff's counsel argued that his mistake of fact rendered enforcement of section 583, subdivision (b) unjust. The court rejected that argument, holding that "[f]ailure of plaintiff's counsel to carefully read and understand the stipulation prior to executing and filing the same is inexcusable conduct and does not provide the foundation for estoppel to assert the five-year mandatory dismissal statute." (*Id.,* at p. 810.)

More importantly, California courts have expressly taken the position that " '[i]gnorance of the law, at least where coupled with negligence in failing to look it up, will not justify a trial court in granting relief [citations], and such facts will certainly sustain a finding denying relief. [Citations.]' [Citation.]" (*Coordinated Construction, Inc.* v. *Canoga Big "A," Inc.,* 238 Cal.App.2d 313, 320 [47 Cal.Rptr. 749].)

In *Coordinated Construction, Inc., supra,* defendant's attorney failed to consider a time limitation rule providing for the filing of responses to

petitions to confirm or vacate an arbitration award. Such failure resulted in defendant's response to be filed late and thus not considered by that court. Defendant then noticed a section 473 motion to set aside the trial court's order confirming the arbitration award. The trial court denied defendant's motion. On appeal, the court affirmed the order denying the section 473 motion, holding that: " 'The issue of which mistakes of law constitute excusable neglect presents a fact question; the determining factors are the reasonableness of the misconception and the justifiability of lack of determination of the correct law.' [Citation.]" (*Id.,* at p. 319.) "[Defendant's] attorney admitted he was ignorant of the law and apparently he was negligent in researching it as he failed to consider the applicable section. Such being the case, the trial court correctly refused to grant the motion." (*Id.,* at p. 320.)

Similarly, in *Security Truck Line* v. *City of Monterey,* 117 Cal.App.2d 441 [256 P.2d 366, 257 P.2d 755], the court affirmed a trial court's denial of defendants' section 473 motion to set aside a default judgment. The court noted that "[t]he sole ground now relied upon to secure a reversal of the order refusing to set aside the default is . . . that the city attorney honestly but erroneously believed that [an] appeal from the order granting the preliminary injunction operated as a stay of all proceedings in the main action." (*Id.,* at p. 444.)

The court went on to note that an honest mistake when the problem is complex and debatable "and where there are no elements of negligence, laxness or indifference, may compel the granting of [a section 473 motion]." (*Id.,* at p. 445.)

However, in affirming the trial court's denial of defendants' section 473 motion the court reasoned that "[t]he assertion that counsel for the defendants believed that the appeal for the preliminary injunction acted as a stay and made it unnecessary for appearances to be made in the main action is not sufficient to compel a reversal of the order denying relief. *The problem of law involved is a simple one. Its solution is readily ascertainable.* When this is coupled with the fact that counsel for plaintiff warned counsel for defendants that appearances were necessary and did not take the default until over two weeks had elapsed after the warning, *it is clear that the trial court was justified in believing that the failure to look up the law indicated at least indifference.*" (*Id.,* at p. 446, italics added.)

█ Similarly here, the declaration by plaintiff's original counsel accompanying plaintiff's section 473 motion fails to offer any adequate

excuse to permit relief under that section. The failure to read carefully section 437c and thereby to realize that all affidavits filed in opposition to a motion for summary judgment must contain only admissible evidence demonstrates indifference and clearly falls within the rule of *Security Truck Line.* The conclusionary assertion that "the affidavits were mistakenly thought to be legally sufficient" fails to explain why such an obvious mistake occurred. The circumstances here involve an easy, uncomplicated rule of law expressly embodied in the Code of Civil Procedure. We cannot say that such a misconception was reasonable or justifiable. Hence, in our view the trial court did not abuse its discretion in denying plaintiff's motion to set aside the summary judgment pursuant to section 473, and its order is affirmed.

### III

█ We note further that plaintiff has also appealed from the trial court's denial of his motion for a new trial. The Supreme Court has trenchantly stated: "No appeal lies from the trial court's denial of defendants' motion for new trial; that ruling may be reviewed only through an appeal from the judgment. [Citations.] Defendants have not appealed from the judgment, and, since timely notice of appeal is a jurisdictional requirement [citation], we are without jurisdiction to review the judgment or the denial of defendants' motion." (*Hamasaki* v. *Flotho,* 39 Cal.2d 602, 608 [248 P.2d 910].)

Plaintiff urges that we construe his appeal from the trial court's denial of his motion for a new trial as an appeal from defendants' summary judgment, an appealable order. He argues that "[o]ur Appellate court [*sic*] have been long committed to respect form less than substance . . . and have applied that rule of liberal construction of a Notice of Appeal to the end that a litigant may properly maintain his right of appeal rather than lose that right because of some inartful framing of such Notice."

We acknowledge that such a device has occasionally been resorted to by courts in this state under certain circumstances. (See, e.g., *Shonkoff* v. *Dant Inv. Co.,* 258 Cal.App.2d 101 [65 Cal.Rptr. 463].) In *Shonkoff,* plaintiff appealed solely " 'from the order denying new trial.' " (*Id.*) The court recognized that "[t]he practice of appealing both from the judgment and the order denying new trial has been repeatedly condemned by dismissal of the latter appeal." (*Id.*) However, because plaintiff's notice of appeal in *Shonkoff* was only directed to the order denying a new trial because of his attorney's error, and "mere error by counsel [should] not

deprive a party of all appeal" (*id.,* at p. 102), the court held "the notice should be deemed to constitute an appeal from the judgment." (*Id.,* at p. 103.)

Unlike the plaintiff in *Shonkoff,* our dismissal of plaintiff's appeal from a nonappealable order will not deprive him "of all appeal." Our decision in this case derives from a consideration of the issue of whether the trial court abused its discretion in denying plaintiff's section 473 motion. Plaintiff had properly appealed from the order of the trial court denying that motion. Now to accede to plaintiff's request and construe his notice appealing from a nonappealable order as an appeal from summary judgment would effectively give plaintiff a second bite at the apple. This he cannot have. In our view, the situation here is one "where a notice of appeal from a nonappealable order cannot and should not be treated to be a notice of appeal from a judgment . . . entered." (*Evola* v. *Wendt Construction Co.,* 158 Cal.App.2d 658, 661 [323 P.2d 158].)

When a party appeals from both appealable and nonappealable orders, courts in this state regularly dismiss the appeal from the latter order. (See, e.g., *Hamasaki* v. *Flotho, supra,* 39 Cal.2d 602, 608; *Rodriguez* v. *Barnett,* 52 Cal.2d 154, 156 [338 P.2d 907].) In dismissing plaintiff's appeal from the trial court's denial of his motion for a new trial, we have done no more than adhere to that well-established practice.

### DISPOSITION

The trial court's order denying plaintiff's section 473 motion is affirmed. Plaintiff's appeal from the trial court's order denying his motion for a new trial is dismissed.

Gardner, P. J., and Tamura, J., concurred.

**McDANIEL, J.,** Concurring.—Although the procedural posture of this case necessarily resulted in a disposition of the appeal as above, the circumstance remains that the substantive dispute which led to this litigation continues unresolved. Moreover, it can readily be inferred from the record that Mr. Martin is not likely to cease his writing and speaking for the purpose of airing his views on the L.D.S. Church. Similarly, it can be inferred that Mr. Johnson and others of equal devotion to the church will not cease to take issue with the opinions of Mr. Martin.

As a consequence, there is likely to be further litigation, and so, because the parties *did* address the substantive issues in their briefs, I feel constrained to discuss those issues as they did appear to have been treated by the trial court in ruling on the motion for summary judgment.

More particularly, from my reading of the record, the trial court appeared to grant defendants' motion for summary judgment because plaintiff failed to show, in those paragraphs of his declaration not stricken, that defendant Johnson had either published or uttered the alleged defamatory statements with "malice." Thus, the trial court assumed, as did both parties, that the *New York Times Co. v. Sullivan,* 376 U.S. 254 [11 L.Ed.2d 686, 84 S.Ct. 710, 95 A.L.R.2d 1412],[1] "actual malice" test applied regardless of whether the defendants were character-ized as media or nonmedia defendants. In my view, defendants here are properly characterized as nonmedia defendants.[2] Thus, while the trial court's assumption that *Sullivan* applied regardless of defendants' status proved to be correct in the final analysis, comment on a refinement of that issue, presented by the facts of this record, is in order.

---

[1]The precise holding in *New York Times Co. v. Sullivan, supra,* 376 U.S. 254, is that: "The constitutional guarantees require, we think, a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." (*Id.,* at pp. 279-280 [11 L.Ed.2d at p. 706].)

I note that the California Supreme Court, in *Good Government Group of Seal Beach, Inc. v. Hogard,* 22 Cal.3d 672 [150 Cal.Rptr. 258, 586 P.2d 572], recently held that "[w]here . . . the allegedly libelous remarks could have been understood by the average reader [as either a statement of fact or opinion and hence ambiguous], the issue [whether the statement is one of fact or opinion] must be left to the jury's determination. [Citation.]" (*Id.,* at p. 682.) More importantly, in articulating a malice definition to be used in cases of publication of ambiguous words the court held: "the jury must find not only that the words were reasonably understood in their defamatory, factual sense, but also that the defendant either deliberately cast his statements in an equivocal fashion in the hope of insinuating a defamatory import to the reader, or that he knew or acted in reckless disregard of whether his words would be interpreted by the average reader as defamatory statements of fact." (*Id.,* at p. 684.)

Arguably, the alleged defamatory statements involved here do not present a problem of ambiguous interpretation as either fact or opinion. In my view they constituted statements of fact.

[2]One commentator has suggested an approach to aid in identifying a media versus non-media defendant. He argues that "[t]here are, . . . identifiable characteristics of newspapers, magazines, television and radio" and "[t]he sufficient presence of these characteristics in any other speaker might also justify calling it a 'media' defendant . . . ." (Note, *First Amendment Protection Against Libel Actions: Distinguishing Media and Non-Media Defendants* (1974) 47 So.Cal.L.Rev. 902, 929.) That commentator contends the *Sullivan* "standard for the media may be justified because these speakers are subject to internal restraints on the abuse of privilege. These internal restraints have been identified as (1) self-policing through professional standards of conduct; (2) the right of

In *Curtis Publishing Co.* v. *Butts*, 388 U.S. 130 [18 L.Ed.2d 1094, 87 S.Ct. 1975], the United States Supreme Court held that the "actual malice" test articulated in *Sullivan* applied with equal force where the plaintiff was a public figure.[3] Hence, a critical issue the trial court here was required to consider, was whether plaintiff met the somewhat esoteric definition developed by the Supreme Court for classifying persons as public figures:[4] "[The public figure] designation may rest on either of two alternative bases. In some instances an individual may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts. More commonly, an individual voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues. In either case such persons assume special prominence in the resolution of public questions." (*Gertz* v. *Robert Welch, Inc.*, 418 U.S. 323, 351 [41 L.Ed.2d 789, 812, 94 S.Ct. 2997].) "[C]ommonly, those classed as public figures have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved." (*Id.*, at p. 345 [41 L.Ed.2d at p. 808].)

Assuming the trial court decided plaintiff was within the parameters of the "public figure" definition articulated in *Gertz*, I conclude that such a decision was correct. Plaintiff, for some 25 years, voluntarily injected himself into and helped fuel a specific controversy; whether Mormonism is a Christian religion or a non-Christian cult. Such a controversy is properly characterized as "a particular public controversy." (See, *Gertz* v. *Robert Welch, Inc.*, *supra*, 418 U.S. 323, 345 [41 L.Ed.2d 789, 808].) Furthermore, plaintiff publicly advocated that Mormonism is a non-Christian cult, through the publication of books and pamphlets, recording tapes, frequent lecturing, and conducting a radio program entitled "The Bible Answer Man." In my view, therefore, plaintiff thrust himself to the

reply in the media involved; (3) fear of the judgment of the market place." (*Id.*, at p. 930.)

In my view neither defendant Johnson nor defendant church is subject to those types of restraints and hence are not properly denoted as media defendants.

[3]In *Curtis Publishing Co.* v. *Butts, supra*, 388 U.S. 130, a majority of five members of the court agreed that the "actual malice test was applicable to 'public figures.'" Four other members of the court instead adopted a standard based on highly unreasonable conduct and phrased in terms of extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers. (See, 388 U.S. at p. 155 [18 L.Ed.2d at p. 1111], (Harlan, J.).)

[4]"The definition of public official may be relatively free of gray areas, but the definition of public figures is disturbingly opaque and difficult to apply. . . ." (Shiffrin, *Defamatory Non-Media Speech and First Amendment Methodology* (1978) 27 UCLA L.Rev. 915, 960, fn. omitted.)

forefront of that controversy and attempted to influence its outcome. (*Gertz* v. *Robert Welch, Inc., supra,* 418 U.S. 323, 345 [41 L.Ed.2d 789, 808].) Thus, plaintiff can be correctly characterized as a public figure.

Assuming plaintiff is a public figure, whether he still must show defendants published or uttered defamatory statements with actual malice is not at all clear. "Throughout the expansive development of the [*Sullivan*] doctrine, very little attention has been given to determining who besides the 'mass media' may utilize this constitutional privilege as a defense in defamation actions." (Note, *First Amendment Protection Against Libel Actions: Distinguishing Media and Non-Media Defendants* (1974) 47 So.Cal.L.Rev. 902-903, fn. omitted.) As already noted, both plaintiff and defendants assumed the *Sullivan* test applied if plaintiff were a public figure. The gravamen of their conflicting arguments at the summary judgment motion therefore was limited to whether plaintiff was a public figure. Both parties unfortunately failed to consider whether the actual malice test should apply if the defendant, like defendants here, were *not* media related. In other words, is *New York Times Co.* v. *Sullivan, supra,* 376 U.S. 254, solely a free press rather than free speech case extending greater constitutional protection to media rather than nonmedia communications? Recently, a commentator has addressed that precise issue. (Shiffrin, *Defamatory Non-Media Speech and First Amendment Methodology* (1978) 25 UCLA L.Rev. 915.)

Professor Shiffrin argues that *Gertz* can be read to infer that the court has adopted "a politically based interpretation of the first amendment. . . ." (*Id.,* at p. 928.) He states: "A clue is provided by the Court's attempt to limit its holding to a limited class of defendants interchangeably described at various points to include newspapers, and broadcasters, the press and broadcast media, publishers and broadcasters, the media, the news media, the communications media, and the press." (*Id.,* at p. 928, fns. omitted.) However, Professor Shiffrin notes that "[t]his apparent attempt to distinguish between media and nonmedia defendants is entirely unexplained." (*Id.,* fns. omitted.) In that regard, he posits a theory explaining that distinction.

Professor Shiffrin reasons that the court, by impliedly limiting First Amendment protections advanced by *Sullivan* to media defendants only, and by holding that communications not relevant to public issues are "nonetheless . . . entitled to a level of first amendment protection" (*id.,* at p. 927) has rejected the "public issues" test advocated by Alexander Meiklejohn to determine the scope of First Amendment constitutional

protections. That approach theorizes that "speech relevant to self-government is absolutely protected under the first amendment [*whether uttered by a media or nonmedia defendant*], speech not relevant to self-government is beyond its scope and . . . fair game for government regulation so long as due process requirements are respected." (Shiffrin, *Defamatory Non-Media Speech and First Amendment Methodology* (1978) 25 UCLA L. Rev. 915, 917, citing Meiklejohn, Political Freedom (1960) p. 27, italics added, fns. omitted.) Professor Shiffrin views the court's rejection of Meiklejohn's theory as demonstrating its "belief that the inability to distinguish precisely between private and public speech requires that some private speech be afforded a level of constitutional protection so that public speech be not unnecessarily chilled." (*Id.,* at p. 929.) Apparently, the court doubts "the wisdom of committing to judges the task" of deciding what is public versus private speech. On that basis, Professor Shiffrin reasons that "the distinction between media and non-media defendants . . . becomes comprehensible" because the majority of media defamation involves matters of public interest while the majority of defamatory comments by nonmedia defendants does not. (*Id.*)

In noting that "by placing all defamatory *media* speech within the scope of the first amendment, the Court may believe it has protected relatively little non-public speech," Professor Shiffrin argues "the Court may fear that if *Gertz* were extended to non-media speech, the result would be to protect much speech having nothing to do with public issues, while safeguarding relatively little that does." (*Id.,* at p. 929, italics added.)

Regardless of whether the court appears to have limited the *Sullivan* test to media defendants only, Professor Shiffrin concludes that to extend the actual malice test to nonmedia defendants when defamatory speech is directed at public officials or public figures would not be inconsistent with the court's current approach. The underlying basis of such an extension would be that defamatory speech directed at either class is relevant to public issues. "So understood, *Gertz* implies that debate on public issues will be sufficiently robust and wide-open for first amendment purposes if defamatory non-media speech is constitutionalized only to the extent that it involves public persons." (*Id.,* at p. 930.)

Professor Shiffrin's reasoning here is persuasive. Regardless of the fact defendants are not media defendants, plaintiff, a public figure, was correctly required by the trial court to prove "actual malice" within the framework of the *Sullivan* "actual malice" test.

He further notes that the apparent limitation of the actual malice test to media defendants in *Gertz* may have origins other than that of a politically based interpretation of the First Amendment. Simply, the court may believe that the media is constitutionally special and therefore entitled to greater First Amendment protection than nonmedia speakers. "Under this view, neither *Sullivan* nor *Gertz* would protect defamatory non-media speech. Thus all defamatory non-media speech, even that discussing public officials, would be beyond the scope of the first amendment." (Shiffrin, *Defamatory Non-Media Speech and First Amendment Methodology* (1978) 25 UCLA L.Rev. 915, 930.)

I agree also with Professor Shiffrin, however, that the "*Sullivan* standards should be required of public officials or public figures whether or not the defendant fits into the media category." (*Id.,* at p. 935.) Professor Shiffrin articulates a persuasive rationale for such a rule: "The idea that first amendment protections should be consciously divvied out in more generous doses to those with knowledge, wealth, and capacity to cause damage is indefensible. Particularly disquieting is the idea that those with greater capacity to cause damage should be afforded special protection. Such a perspective would not only bespeak a disrespect for the interest in reputation, but it would also reflect an indifference to the growing public concern with the 'vast accumulations' of power in the 'modern media empires.' " (*Id.,* at p. 934, fns. omitted.)

Moreover, grafting principles of "mediaocracy" onto the First Amendment thereby granting media defendants a preferred status and greater protection would have substantial detrimental effects on society in general. Such a rule likely would "deter nonmedia contributions to the democratic dialogue (and thus would weaken the media's contribution), would favor those with greater capacity to cause damage and with greater ability to compensate for that damage (by spreading the risk), would require difficult determinations as to which communications would and would not merit the label 'press' or 'media,' would strain basic principles of first amendment equality, and would diminish respect for the democratic process." (*Id.,* at p. 935, fns. omitted.)

In sum, if the issue were properly before us, I would vote to adopt the analysis discussed here and apply the *Sullivan* actual malice test where a nonmedia defendant engaged in defamatory speech concerning a public figure.

A petition for a rehearing was denied February 13, 1979.