[No. C054250. Third Dist. Oct. 29, 2009.]

THE PEOPLE, Plaintiff and Respondent, v.
JOSHUA DANIEL TUGGLES et al., Defendants and Appellants.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

---

*Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of parts VIII and IX of the Discussion.

## COUNSEL

Sharon G. Wrubel and Jerry D. Whatley, under appointments by the Court of Appeal, for Defendants and Appellants.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette and Michael P. Farrell, Assistant Attorneys General, Charles A. French and Jeffrey D. Firestone, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**SIMS, Acting P. J.**—A jury convicted defendants Joshua Daniel Tuggles and Tyrone Duwane Mollett of first degree murder (Pen. Code, § 187, subd. (a)),[1] found true the allegation that Tuggles committed the offense with a firearm

---

[1] Undesignated statutory references are to the Penal Code.

(§ 12022, subd. (a)(1)), and that Mollett personally discharged a firearm resulting in the death of a nonaccomplice (§ 12022.53, subd. (d)). On appeal, defendants contend that the trial court erred by (1) failing to caution the jury about inferring consciousness of guilt from defendants' flight from the scene of the murder, (2) denying their joint motion for a new trial based on juror misconduct, and (3) denying their motions for access to jurors' telephone numbers and addresses.

Tuggles separately argues that (1) the trial court erred in allowing the hearsay statement of a witness who testified about hearing in the neighborhood that Tuggles "wanted to shoot up the block there on Charbono,"[2] (2) CALCRIM Nos. 318 and 335, when read together, gave the jury the mistaken impression that an accomplice's testimony could be corroborated by the same accomplice's prior out-of-court statements, (3) the cumulative effect of the prejudice from the errors he asserts requires reversal of his conviction, and (4) the fee for preparation of his probation report must be stricken due to his inability to pay.

Mollett separately argues that (1) the trial court erred in restricting cross-examination of Eugene Shands, who drove defendants to the location of the murder and testified as a witness for the prosecution, and (2) the fees for preparation of his probation report and his appointed attorney must be stricken because they were not actually imposed by the trial court.

In the published portion of the opinion, we explain why we shall affirm the murder convictions and firearm enhancement allegations. In the unpublished portion, we shall strike the fees for Mollett's probation report preparation and his appointed counsel. However, we will not disturb the probation report preparation fee imposed on Tuggles.

## FACTUAL AND PROCEDURAL HISTORY

In June 2005, the Sacramento County District Attorney filed a consolidated complaint, later deemed an information, that charged Mollett, Tuggles, Shands, Jon Paul Mitchell, and Daniel Joseph Neves with murder (§ 187, subd. (a)). The information further alleged that all of the defendants were principals in the murder and committed the offense with a firearm (§ 12022, subd. (a)(1)). Mollett was charged with personal use of a firearm resulting in the death of a nonaccomplice (§ 12022.53, subd. (d)).

In December 2005, Shands pled no contest to voluntary manslaughter and admitted the firearm allegation. In exchange for testifying against the remaining defendants, Shands hoped to receive a four-year prison sentence.

---

[2] The murder was committed on a residential driveway on Charbono Way in Rancho Cordova.

Evidence adduced during the jury trial established that Adrian Romero, Steven Olivas, and Tuggles had been good friends until June 2004. They would sometimes hang out together at Olivas's house on Charbono Way. Tuggles lived with his family in a house located on Aramon Drive, which was about a block away from Olivas's residence. Daniel Neves lived next door to Tuggles. Neves shared his home with Mollett, Michael Nagy, Sara Cashmark, and her infant, Isaac.

Romero and Olivas became estranged from Tuggles after he backed down from a fight. Rather than fighting, Tuggles fell to the ground after being hit once. Tuggles stayed on the ground, having injured his leg while falling. Romero called Tuggles a "bitch," and the crowd that had gathered to watch the fight dispersed disappointedly. Afterward, Romero and Olivas stopped talking to Tuggles. Cassandra Bake stopped dating Tuggles.

People in the neighborhood soon started calling Tuggles a "bitch" because he "didn't do what he said he was going to do." Tuggles stopped hanging out on Charbono Way. Instead, he would drive by Olivas's house and "stare hard at them."

Beginning in November 2004, tensions developed and escalated between the Charbono and Aramon groups as they would slowly drive by each other's houses. The occupants of the cars would stare or yell at the people on the street, who responded in kind.

On December 10, 2004, Romero and his friend, Jerrel, argued with Tuggles's sister, Ashley, in front of Neves's home. Jerrel pushed Ashley to the ground. Cashmark had just gotten her infant to sleep and told them to quiet down. Romero ran up to her window and the two began a vulgar argument. Nagy came outside and started beating up Jerrel.

When Tuggles came home, he became upset upon learning that his sister had been pushed down. He paced back and forth. Two witnesses testified that Tuggles did nothing more, but another testified that Tuggles chased after Jerrel with a gun.

About 1:30 a.m. on December, 13, 2004, Romero and Jerrel returned to Neves's home—this time with Olivas. Romero wanted to talk about rumors that the two groups planned to "shoot up" each other's homes. A guest at Neves's home answered the door and invited them inside. Romero and Jerrel attempted to enter, but Cashmark told them to leave. Romero pulled a knife from his pocket and said they were there for some "clear up." Nagy and others pushed Romero and Jerrel outside. In the dark, there was much commotion. Olivas saw someone with a gun. Olivas urged Romero and Jerrel

to leave. While they were walking away, someone fired about 10 gunshots into the air. Cashmark called the police, reporting that the shots were fired by Romero's group. The police found six expended nine-millimeter shells and one nine-millimeter bullet nearby.

In January or February 2005, Bake was at Neves's home when Tuggles "dedicated" a rap song with the lyrics "get our Glocks and blow your block away" to the group that hung out on Charbono Way. Bake further testified that Tuggles said that "on a Friday or Saturday night that they were going to go over there and just start shooting down the street" because that was when Romero and his friends usually spent time outside. Olivas testified that he had "heard in the neighborhood that [Tuggles] had said how he wanted to shoot up the block there on Charbono." Bake also heard Tuggles twice say that before he died, Romero would be dead.

Bake had several times seen Tuggles with a sawed-off shotgun he called his "Elmer Fudd." Tuggles had sawed off the barrel with a hacksaw. He also modified the stock and added a pistol grip. Tuggles would sleep with the gun next to him.

In early March 2005, Tuggles drove by Olivas's house with Mollett and Neves. Olivas and his friends were playing basketball in the driveway when Mollett and Neves exited the car. Mollett and Neves challenged them to fight, but were told, "[O]ur beef is not with you, it's with [Tuggles], the driver." Mollett, Neves, and Tuggles eventually drove away without a fight.

In March 2005, Shands was having relationship difficulties with his girlfriend and had been staying at Neves's home. On March 20, 2005, Shands, Mollett, Neves, Nagy, and Cashmark were socializing, drinking, smoking marijuana, and using methamphetamine. Shands was high, which was not unusual. He had begun using cocaine daily in 1985, but switched to methamphetamine around 2001. Shands used methamphetamine on a nearly daily basis. That evening, he was under the influence of alcohol, marijuana, and methamphetamine.

Around 4:00 p.m., Olivas and Romero walked to the nearby Eco Liquor store. As they entered, they encountered Nagy, who had gone to the store to buy diapers for Cashmark. Romero attempted to talk to Nagy about rumors that Nagy wanted to shoot up the Charbono group. Nagy brushed him off, saying, "[N]o, not right now. I don't want to talk to you."

When Nagy returned home without diapers, Cashmark instructed him to go back and get them. Nagy said that some people had tried to jump him and he did not want to go back. Cashmark told Nagy to take someone with him to the store, and fight if necessary, but to come back with diapers.

Olivas and Romero spent the evening drinking beer with their friend, Regina Zamarron. Around midnight, Zamarron drove them back to the store to buy more alcohol. Olivas waited outside. Shands drove up in his Ford Bronco with Nagy, Neves, Mollett, and Tuggles. Tuggles waited outside while the rest of them entered the store. Olivas asked Tuggles, "What's going on?" Tuggles giggled a bit and responded, "I don't know."

Romero and Zamarron came out of the store and ran into the others. Romero wanted to fight, but the others declined. Olivas wanted to leave and avoid trouble. The two groups argued and called each other names. Zamarron saw one of the men from the Ford Bronco holding a knife at his side. Not wanting her friends to get hurt, Zamarron stepped in the middle and tried to stop them from fighting. When a police car drove by, everyone got into their cars to leave. Before leaving, Romero told Mollett, "I hope you don't think that I got punked." As they drove off, someone from Zamarron's car yelled, "[W]e are going to see you guys later." Everyone in the Bronco was "all fired up to fight."

When the Bronco returned to Neves's home, Nagy went to his room to relax by watching movies with Cashmark. Soon afterward, Jon Paul Mitchell and Tyler Ollum arrived.

When Zamarron's car drove by Neves's home twice within 20 minutes of the liquor store encounter, Mollett angrily exclaimed, "[W]e need to take care of this." Mollett talked with Neves, Mitchell, Ollum, Tuggles, and Shands about going to Olivas's house and "doing something." Nagy got out his rifle, but then decided not to get caught up in the drama after he talked to Cashmark and Shands. Mollett called Nagy a punk and a bitch.

Tuggles went home to get his shotgun. Tuggles walked around holding his gun, saying they needed to "do something" to "get these punks." Shands told him they should solve the problem without guns. If there was going to be a fight he was willing to drive them to Charbono Way, but would not join in the fight.

Mollett wanted to go to Charbono Way to fight. Neves, Mitchell, and Tuggles decided to accompany him to make sure that the fight would be fair. Tuggles handed Mollett his shotgun. Mollett called Nagy a punk and said he would go over there "to blast them" himself.

Mollett, Mitchell, and Neves started walking toward Charbono Way. Shands did not see anyone take a weapon along. About five minutes later, Shands drove around the corner to make sure that Neves was okay. Neves was his coworker and needed to drive a second truck to work the next morning. Tuggles accompanied Shands in the Bronco. Shands did not see Tuggles bring a weapon.

As Shands drove around the corner, he saw Romero and Zamarron. Zamarron asked what was going on, and Shands replied that there might be a fight. When Shands caught up with Mollett, Mitchell, and Neves, he told them "there is only two guys, and he is with his girlfriend, let's go home." Mollett, Mitchell, and Neves got into the backseat of the Bronco. Mollett told Shands to drive by Olivas's house, and Shands complied.

Romero and Zamarron were standing in the street near Olivas's house. Olivas was making himself something to eat inside the house. Romero called Olivas by cell phone to tell him to come outside.

Meanwhile, Mollett told Shands to let him out of the vehicle so that he could fight Romero. Tuggles and Shands got out and pulled their seats forward to let Mollett, Mitchell, and Neves out of the Bronco. Tuggles and Shands got back in.

Mollett argued with Romero for 10 to 15 seconds before Tuggles got back out of the Bronco. Tuggles pulled his shotgun out of his pants, ran up to Mollett, and handed him the gun. Tuggles returned to the Bronco. Shands attempted to leave.

Zamarron told them to leave, but Mollett moved toward Romero with the shotgun. No one said anything. Romero picked up Zamarron from behind and moved her toward the back of Olivas's driveway. Romero was still holding Zamarron when Mollett fired. Zamarron fell to the ground uninjured. Then she heard two or three more shots being fired. Upon opening her eyes, she saw Romero lying on his back. He was bleeding and nonresponsive. Romero died of a shotgun wound in his chest.

Shands was having trouble starting the Bronco while Mitchell and Neves were getting in. Tuggles told Shands to wait for Mollett. Mollett returned to the Bronco and jumped in just as Shands started to drive off. Mollett threw the shotgun on the floorboard, and Shands saw that it was Tuggles's gun.

Shands drove a short distance in a panic, stopped, and ordered everyone out of the car. Mollett, Mitchell, and Neves got out. Mollett took the shotgun with him. Shands drove a little farther before parking on the side of the road. Shands and Tuggles got out of the car and started to walk. After a few minutes, Tuggles called his mother. Shands asked Tuggles why he had brought a gun into his car. Tuggles replied that he did not know why and apologized.

Tuggles's mother picked them up and dropped off Shands at his house. She took Tuggles to his grandmother's house, where he stayed until the next day.

Shortly after Tuggles's mother dropped Shands off, he phoned Neves. Mollett got on the line and told Shands, "[Y]ou need to keep your fucking mouth shut." In the morning, however, Shands went to the police department and gave a statement in hopes of exonerating himself. Instead, he was arrested for murder.

A neighbor called the police immediately after the shooting. When the police arrived, the neighbor discovered a gun clip lying on the ground near where the Bronco had been parked. The police found pieces of shotgun wadding and an expended 12-gauge shell on the driveway of Olivas's house. A hole in the fence near the driveway and the wound in Romero's chest were both caused by shotgun blasts. Based on the size of the wound, Romero was probably shot from a distance of seven and half feet. The shotgun was never recovered.

In the attic of Tuggles's home, the police found a duffle bag containing a simulated handgun as well as a shotgun butt and other firearm parts. The duffle bag also contained a bong with Tuggles's fingerprints on it. In Tuggles's closet, the police found a live shotgun round under a pile of clothes.

Testifying on his own behalf, Tuggles denied ever owning a gun or threatening to kill Romero. Instead, Tuggles considered Romero to be a friend even while they "drifted apart" after the fizzled fight. Tuggles could not explain how the shotgun butt and marijuana paraphernalia discovered by the police made their way into the attic of his house.

Around 6:00 or 7:00 p.m. on the night of Romero's murder, Tuggles began hanging out with his girlfriend, Sabrina O'Neal, at Neves's home. Tuggles was drinking and smoking marijuana. Although Tuggles later went to the liquor store with his friends, he did not go anywhere near Romero.

Upon returning from the liquor store, Tuggles saw Mitchell and Nagy compare their guns inside Neves's home. Nagy showed his sawed-off shotgun, and Mitchell displayed what looked like an assault rifle. Mitchell put his rifle away, but Nagy continued to hold on to his shotgun.

When Tuggles went outside to smoke a cigarette, he heard Shands report that Romero's group drove by. Mollett said they were "punking out" and that he would fight Romero's group himself. Mollett, Mitchell, Neves, Shands, and Tuggles ended up driving over toward Charbono Way. Tuggles did not bring a shotgun.

Outside Olivas's house, Mollett, Mitchell, and Neves got out of the car and walked toward Romero and Zamarron. Mollett kept moving in Romero's

direction, but Mitchell and Neves retreated toward Shands's Bronco. Tuggles heard two shots ring out. When Mollett got back into the Bronco, Tuggles saw him carrying a long gun. Tuggles had not given him the gun. Shands was "flipping out" as he drove away. Tuggles was in a state of shock.

After Shands parked the Bronco, Tuggles got a ride from his mother to his grandmother's house. Tuggles stayed there until he turned himself in to the police on Tuesday morning.

The jury convicted Tuggles and Mollett of first degree murder and found the allegations of firearm use to be true. Neves and Mitchell were acquitted.

On May 12, 2006, Tuggles filed a motion requesting jurors' addresses and telephone numbers. The trial court found that Tuggles had shown good cause to interview jurors. The court sent jurors a letter informing them of a hearing to address the release of their contact information. The letter gave jurors the options to consent or object to the disclosure of their contact information.

On June 8, 2006, the trial court noted that it had received declarations from many of the jurors. The court stated that it would send a second letter that more completely explained jurors' options for responding to the request for their information. Juror No. 7, who was present in court that day, consented to being contacted.

On August 17, 2006, Mollett's counsel stated that Jurors Nos. 5 and 9 had already been interviewed. The trial court denied the release of contact information for Jurors Nos. 1, 2, 4, 8, 10, 11, and 12, as well as Alternate Jurors Nos. 1, 4, and 6—all of whom had responded by mail to object to the disclosure. Alternate Juror No. 2 initially objected, but later agreed to allow his phone number to be given to defense counsel. Juror No. 3 appeared in person to object to the release of his information, and the court ordered his contact information to remain sealed. The trial court presumed that nonresponsive jurors and alternates did not object to the disclosure of their contact information, and released their information to counsel.

On September 15, 2006, the trial court allowed counsel access to Juror No. 6's contact information.

On September 20, 2006, Mollett filed a motion for disclosure of jurors' phone numbers and addresses that was similar to Tuggles's earlier motion. On September 22, 2006, the trial court heard the motion and ruled that it had no discretion to release the information of jurors who had objected. Thus, the trial court ordered no additional release of juror contact information.

On October 18, 2006, Mollett filed a motion for new trial based on juror misconduct. On October 27, 2006, Tuggles orally joined in the motion. The prosecution opposed the motion. The trial court heard and denied the motion.

On November 17, 2006, the trial court sentenced Tuggles to prison for 25 years to life, and ordered him to pay, among other fines and fees, $702 for preparation of his probation report. The court sentenced Mollett to prison for 50 years to life. The abstract of judgment lists, among other fines and fees that Mollett was ordered to pay, $702 for preparation of his probation report and $2,440 for appointed counsel.

## DISCUSSION

### I

### Tuggles's Hearsay Challenge

Tuggles contends that the trial court erred in admitting a hearsay statement made prior to the murder to the effect that Tuggles "wanted to shoot up the block there on Charbono."[3] He argues that the erroneous admission of this statement rendered the trial unfair because it allowed the jury to find premeditation on the basis of nonadmissible evidence. We disagree.

### A

The prosecution called Olivas as its second witness at trial. Olivas's testimony provided extensive evidence in support of the murder charge, but not an eyewitness account of the actual shooting. Olivas was inside his house at the moment Romero was shot on the driveway.

Tuggles sought to show that he neither brought a shotgun to Charbono Way nor handed one to Mollett immediately before the murder. To this end, Tuggles's counsel cross-examined Olivas, pursuing a line of questioning to show that Tuggles had a reputation for nonaggression:

"Q [by Tuggles's counsel] Okay. So you guys thought he had a [reputation] of just talking [a] lot?

"A [by Olivas] Maybe, yeah.

"Q And just wouldn't back it up?

---

[3] Mollett has not joined this argument.

"A Yeah.

"Q Could basically talk the talk but couldn't walk the walk?

"A Sometimes."

On redirect, the prosecutor followed up on the issue of Tuggles's reputation immediately after an unreported sidebar conference was held. The transcript shows the following occurred:

"[The prosecutor]: Your Honor, can we approach just briefly?

"THE COURT: Yes.

"(Whereupon off-the-record discuss[ion] took place.) [¶] . . . [¶]

"Q [The prosecutor]: Mr. Olivas, with respect to [Tuggles] and his reputation in the neighborhood—only if you know—had you ever heard in the neighborhood that [Tuggles] had said how he wanted to shoot up the block there on Charbono?

"A [by Olivas] Yeah. I heard something like that because of Breece and Vlade.

"THE COURT REPORTER: Who?

"THE WITNESS: Vlade. Vladimir who lives with Breece, too.

"Q Okay. That's all.

"A Okay. Yes.

"Q Without going into too much detail, . . . you had heard through the grapevine on the street that [Tuggles] wanted to shoot up the block?

"A Yes."

Defendant challenges Olivas's answers to the prosecutor's questions about Tuggles's reputation as improperly admitted hearsay.

### B

The Attorney General urges us to hold that Tuggles forfeited the issue by failing to object. The record shows that defense counsel did not object after the statements now challenged as hearsay. Even so, the issue was preserved for review.

■ Counsel may object to the admission of evidence in an unreported sidebar conference. (*People v. Pinholster* (1992) 1 Cal.4th 865, 937 [4 Cal.Rptr.2d 765, 824 P.2d 571].) When the trial court later memorializes the timeliness of the objection "for the record," the issue is preserved for review. (*Ibid.*) The purpose of the forfeiture rule is to encourage counsel to object and thereby give the trial court an opportunity to consider the objection. (Evid. Code, § 353; *People v. Kipp* (2001) 26 Cal.4th 1100, 1124–1125 [113 Cal.Rptr.2d 27, 33 P.3d 450].)

Here, the record indicates that the sidebar conference immediately preceding the prosecution's questioning of Olivas about Tuggles's reputation involved an objection by defense counsel. The trial court later noted the objection lodged by Tuggles's counsel to the prosecution's line of questioning:

"THE COURT: We're out of the presence of the jury. [¶] I do want to register for the record [Tuggles's counsel's] objection to [the prosecutor] asking the witness about whether Olivas had heard on the street about [Tuggles] shooting up the neighborhood. [¶] My ruling was that [Tuggles's counsel] had examined the witness regarding [defendant] Tuggles'[s] character in that particular regard and that [the prosecutor's] question was proper cross[4] of that. [¶] Anything more for the record?

"[Tuggles's counsel]: No, your Honor.

"[The prosecutor]: Your Honor, briefly, could I just indicate before asking the question we had approached, and I requested and I also felt that [Tuggles's counsel] didn't just ask what his view of [defendant] Tuggles was but also what the view of the street was and his [reputation].

"THE COURT: Right.

"[Tuggles's counsel]: My objection obviously was, I asked him if he thought the term bitch and walk the walk, talk the talk, et cetera."

■ Having objected during the sidebar conference, Tuggles preserved the evidentiary challenge for review. (*People v. Pinholster, supra,* 1 Cal.4th at p. 937.) While it is true, as the Attorney General points out, that defense counsel could have objected immediately after the questioning, such objection would have been futile in light of the trial court's ruling at the sidebar conference. Defense counsel is not required to make a futile objection to preserve an issue for appeal. (*People v. Hill* (1998) 17 Cal.4th 800, 820 [72 Cal.Rptr.2d 656, 952 P.2d 673].) Accordingly, we proceed to consider the issue on the merits.

---

[4] The court meant to refer to redirect examination by the prosecutor.

## C

■ Hearsay "is evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated." (Evid. Code, § 1200, subd. (a).) Unless the statement falls within an exception to the rule, hearsay is inadmissible. (Evid. Code, § 1200, subd. (b).)

■ In addition to the prohibition on hearsay, the Evidence Code also renders inadmissible "evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct)" when the evidence is "offered to prove his or her conduct on a specified occasion." (Evid. Code, § 1101, subd. (a).) In criminal cases, the prosecution is prohibited from introducing evidence of a defendant's bad character or reputation in order to prove he or she acted in conformity with that character in committing the charged offense. (*People v. Ewoldt* (1994) 7 Cal.4th 380, 393 [27 Cal.Rptr.2d 646, 867 P.2d 757].)

By contrast, a defendant may introduce "evidence of the defendant's character or a trait of his character in the form of an opinion or evidence of his reputation" in order to "prove his conduct in conformity with such character or trait of character." (Evid. Code, § 1102, subd. (a).) However, "[w]hen a criminal defendant presents opinion or reputation evidence on his own behalf the prosecutor may present like evidence to rebut the defendant's evidence and show a likelihood of guilt. (Evid. Code, § 1102, subd. (b).)" (*People v. Hempstead* (1983) 148 Cal.App.3d 949, 953 [196 Cal.Rptr. 412].)

■ A defendant who elicits character or reputation testimony opens the door to the prosecution's introduction of hearsay evidence that undermines testimony of his good reputation or of character inconsistent with the charged offense. "When a defendant elects to initiate inquiry into his own character, presumably to establish that one with his lofty traits would be unlikely to commit the offense charged, an anomalous rule comes into effect. Opinion based upon hearsay is permitted. (Evid. Code, § 1324; *People* v. *Cobb* (1955) 45 Cal.2d 158 [287 P.2d 752].) But the price a defendant must pay for attempting to prove his good name is to throw open a vast subject which the law has kept closed to shield him. (Evid. Code, §§ 1101, 1102.) The prosecution may pursue the inquiry with cross-examination as to the contents and extent of the hearsay upon which the opinion was based, and may disclose rumors, talk, and reports circulating in the community." (*People v. Eli* (1967) 66 Cal.2d 63, 78 [56 Cal.Rptr. 916, 424 P.2d 356].)

The prosecutor's scope of inquiry into a defendant's reputation is not unlimited. The prosecution "must not be permitted to take random shots at a

reputation imprudently exposed, or to ask groundless questions 'to waft an unwarranted innuendo into the jury box' . . . ." (*People v. Eli, supra*, 66 Cal.2d at p. 79, quoting *Michelson v. United States* (1948) 335 U.S. 469, 481 [93 L.Ed. 168, 69 S.Ct. 213].) A good faith belief by the prosecution that the acts or statements asked about actually happened suffices to allow questioning of the witness about their occurrence. (*People v. Ramos* (1997) 15 Cal.4th 1133, 1173 [64 Cal.Rptr.2d 892, 938 P.2d 950].)

■ The prosecution may explore opinion-based hearsay by asking whether the witness has heard of statements at odds with the asserted good character or reputation. "The rationale allowing the prosecution to ask such questions (in a 'have you heard' form) is that they test the witness'[s] knowledge of the defendant's reputation." (*People v. Wagner* (1975) 13 Cal.3d 612, 619 [119 Cal.Rptr. 457, 532 P.2d 105], citing inter alia *Michelson v. United States, supra*, 335 U.S. at p. 479.)

Here, the prosecution asked such "have you heard" questions of Olivas only after defense counsel elicited testimony about Tuggles's reputation in the community. Defense counsel cross-examined Olivas to show that Tuggles had a reputation for nonaggression. Also on cross-examination, Olivas testified that Tuggles never stopped by himself on Charbono Way after he and Romero became estranged. This testimony tended to show that Tuggles was not prone to violence.

■ Although Olivas was called as a witness for the prosecution, the answers given in response to the questions by Tuggles's counsel allowed for impeachment of that testimony by the prosecution. The prosecution may impeach its own witness. "If the testimony proves adverse, the opportunity to impeach it should not be denied . . ." to the prosecution. (*People v. Adams* (1968) 259 Cal.App.2d 109, 122–123 [66 Cal.Rptr. 161].) To this end, the prosecutor asked Olivas whether he had "heard in the neighborhood that [Tuggles] wanted to shoot up the block there on Charbono." This question permissibly sought to test the reliability of Olivas's earlier testimony about Tuggles's reputation. (*People v. Eli, supra*, 66 Cal.2d at p. 78.)

Moreover, the prosecutor's question was not one that elicited hearsay because the answer concerned whether Olivas had heard something at odds with his earlier testimony about Tuggles's reputation for nonaggression. The statement of Tuggles wanting to "shoot up" Charbono was not offered for the truth of the assertion, but to undermine Olivas's prior reputation testimony. Thus, Olivas's answer was not hearsay. (Evid. Code, § 1200, subd. (a).)

The trial court did not err in allowing the prosecution to question Olivas about Tuggles's reputation in the neighborhood after his reputation was placed at issue by the defense.

## D

Even if the trial court erred in admitting the challenged portion of Olivas's testimony, we would nonetheless decline to reverse the conviction. Absent the error claimed by Tuggles "it is not reasonably probable that the jury's verdict would have been different had these statements been excluded." (*People v. Bunyard* (1988) 45 Cal.3d 1189, 1205 [249 Cal.Rptr. 71, 756 P.2d 795], citing *People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].) Olivas's testimony about Tuggles's wanting to shoot up Charbono Way was cumulative to the more damaging testimony given by Bake, his former girlfriend.

Bake testified that she was present when Tuggles "dedicated" a song to the Charbono group with the lyrics "get our Glocks and blow your block away." Bake further recounted that Tuggles said that "they were going to go over there and just start shooting down the street." Bake's testimony provided a more vivid and detailed account of Tuggles's threats than that provided by Olivas's acknowledgment that he had heard Tuggles wanted to "shoot up" Charbono Way.

Tuggles himself testified that he never threatened to shoot up Charbono Way or dedicated the rap song with violent lyrics to the Charbono group. Even without Olivas's testimony, Tuggles would certainly have been asked about wanting to shoot up Charbono Way as described by Bake. Bake's testimony and Tuggles's denial of threats to shoot up Charbono Way rendered Olivas's brief testimony on the matter insignificant by comparison.

The trial court did not err in admitting Olivas's testimony in response to questions by the prosecution about Tuggles's reputation in the community. Even assuming for the sake of argument the trial court erred, it is not reasonably probable that a different result would have occurred absent the error.

## II

### Restrictions on Cross-examination of Shands

Mollett contends the trial court abused its discretion and violated his federal constitutional rights by restricting cross-examination of Shands.[5] Mollett sought to ask Shands about whether he had previously been in prison and whether he had voluntarily submitted to a 72-hour hold for mental health treatment and evaluation. The trial court disallowed cross-examination of Shands on these issues, finding the prejudicial nature of the evidence

---

[5] Tuggles has not joined this argument.

exceeded its probative value. The court also noted that the "mini-trials" necessary to educate the jury about the import of prior prison terms and 72-hour holds would require an undue consumption of time.

We shall conclude that the trial court did not abuse its discretion under Evidence Code section 352 or violate Mollett's federal constitutional rights by restricting cross-examination of Shands.

### A

Outside the presence of the jury, Mollett's counsel argued that Shands "voluntarily underwent a 72-hour hold, it related to his stability. [¶] He is taking anxiety medication." Counsel further argued that "he is taking medication for anxiety, depression, at the same time that he's doing drugs, and other things. [¶] His stability is in question there." Thus, the defense sought to question Shands about the 72-hour hold.

The prosecutor countered that the evidence of a voluntary 72-hour hold would be prejudicial and asked the trial court to exclude it pursuant to Evidence Code section 352.

Mollett's counsel also argued that he should be allowed to cross-examine Shands about his prior prison terms. Counsel reasoned that "it relates to his mindset, how he is able to manipulate being a snitch in two different cases. [¶] He knows how the inner workings work in state prison." The prosecution objected to the questioning, noting that the jury was going to hear about Shands's numerous convictions anyhow.

The trial court ruled, "[Y]ou can ask him whatever kind of drugs he was taking at the time. Either [the time] he is perceiving the things he is testifying to, or the time he is testifying, and that certainly is relevant. [¶] But the 72-hour hold . . . is sufficiently collateral. Its probative value is entirely outweighed by the consumption of time it would take to explore . . . all the different possibilities it can mean. [¶] As far as prison is concerned, you can go as far as you want with him snitching in order to stay out of prison.[6] [¶] But what happens once he is in prison, whatever experiences he has had in prison, I can't imagine how those would relate to whether he is a snitch or not. [¶] And to go into that and educate the jury about that would consume an undue amount of time. So I find its probative value is outweighed by the

---

[6] Shands testified that while awaiting trial in jail, his cellmate asked him to find someone to kill a witness. Shands informed his lawyer and notified law enforcement. He then wore a recording device inside the cell to gather evidence against his cellmate. Shands later testified against him.

prejudicial consumption of time. [¶] So I will disallow talk about the prison and talk about the 72-hour hold."

Mollett's counsel responded to the ruling as follows:

"[Mollett's counsel]: I can't ask him if he has ever been in prison, that one question?

"THE COURT: You know, if you boil it down to that, no, that's irrelevant. I think, as [the prosecutor] said, he has no—I don't think you got prison priors, but I don't see any relevance in whether he went to prison.

"[Mollett's counsel]: [The prosecutor] argued for me. I think there is [*sic*] enough priors there, so . . . they know that much about him. One little more step shouldn't be that prejudicial.

"THE COURT: There is no probative value, so I will disallow it."

## B

█ Shands's prior prison terms and voluntary 72-hour hold were matters collateral to the murder charges. "A collateral matter has been defined as 'one that has no relevancy to prove or disprove any issue in the action.' (1 Jefferson, Cal. Evidence Benchbook (3d ed. 1997) §§ 27.105, 27.106, pp. 478–479.) A matter collateral to an issue in the action may nevertheless be relevant to the credibility of a witness who presents evidence on an issue; always relevant for impeachment purposes are the witness's capacity to observe and the existence or nonexistence of any fact testified to by the witness. (Evid. Code, § 780, subds. (c), (i); *People* v. *Lang* (1989) 49 Cal.3d 991, 1017 [264 Cal.Rptr. 386, 782 P.2d 627].) As with all relevant evidence, however, the trial court retains discretion to admit or exclude evidence offered for impeachment. (Evid. Code, § 352; *People* v. *Douglas* (1990) 50 Cal.3d 468, 509 [268 Cal.Rptr. 126, 788 P.2d 640].) A trial court's exercise of discretion in admitting or excluding evidence is reviewable for abuse (*People* v. *Alvarez* (1996) 14 Cal.4th 155, 201 [58 Cal.Rptr.2d 385, 926 P.2d 365]) and will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice (*People* v. *Jones* (1998) 17 Cal.4th 279, 304 [70 Cal.Rptr.2d 793, 949 P.2d 890])." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9–10 [82 Cal.Rptr.2d 413, 971 P.2d 618].) "[T]he discretion to be exercised is that of the trial court, not that of the reviewing court. Thus, even if the reviewing court might have ruled otherwise in the first instance, the trial court's order will yet not be reversed unless, as a matter of law, it is not supported by the record." (*Martin v. Johnson* (1979) 88 Cal.App.3d 595, 604 [151 Cal.Rptr. 816].)

Here, the trial court did not act in a manner that was arbitrary, capricious, or exceeded the bounds of reason. The trial court's concern about having "mini-trials" regarding the meaning and weight to be assigned to prior prison terms and the 72-hour hold led to the rational conclusion that an undue amount of time would be consumed for the limited probative value with regard to Shands's credibility.

The record does not indicate the basis for Shands's voluntary 72-hour hold. Mollett suggests that the hold was "presumably under the provisions of Health and Safety Code section 5150." We cannot make that presumption. *Welfare and Institutions Code* section 5150 provides for involuntary 72-hour treatment and evaluation. (*Ford v. Norton* (2001) 89 Cal.App.4th 974, 979 [107 Cal.Rptr.2d 776].) Given Shands's extensive history of drug use, it is more likely that the *voluntary* 72-hour hold was pursuant to Welfare and Institutions Code section 5343, which provides for short-term treatment and evaluation "if any person is a danger to others or to himself or herself, or gravely disabled, as a result of the use of controlled substances . . . ." It is also possible that the hold was requested for a "mental disorder" rendering him "a danger to others, or to himself, or . . . gravely disabled . . . ." (Welf. & Inst. Code, § 5201.) The actual basis for the 72-hour hold would have needed to be explained to the jury along with the circumstances before, during, and after the commitment. The trial court's concern about a "mini-trial" on the issue was well founded.

Even apart from the 72-hour hold, the jury heard ample evidence allowing it to question Shands's reliability as a witness. Shands admitted to a long history of cocaine and methamphetamine abuse. Moreover, Shands acknowledged that, on the night of the murder, he was under the influence of alcohol, methamphetamine, and marijuana. Defense counsel had ample opportunity to cross-examine Shands about his ability to perceive and recall the events on the night of the murder. Given Shands's extensive history of drug addiction combined with his admissions of being affected by a combination of drugs on the night of the murder, the probative value of a prior 72-hour hold on Shands's reliability was slim.

Shands's credibility also sustained attack by defense counsel based on his prior convictions. Shands admitted to having "a pretty lengthy criminal history" in addition to the plea to voluntary manslaughter in this case. The jury heard him admit convictions for two burglaries, assault with a deadly weapon, passing bad checks, felony theft, petty theft, and petty theft with a prior conviction.

Based on this record of convictions, Mollett's counsel argued to the jury that Shands "[h]ad numerous contacts with law enforcement, three times

felon, one for assault with a deadly weapon, others for theft and theft related offenses. [¶] Testified that he knew about law enforcement from experience. He said based on questions from other counsel that the mini 14 was used in prison.[7] *Based on that, possibly you could infer he has been to prison.*" (Italics added.) With the substantial record of criminal convictions and argument by Mollett's counsel, the jury would have gained little additional insight into Shands's credibility by actually hearing that he had been to prison, as the evidence strongly suggested.

The jury also heard about Shands wearing a hidden recording device and testifying against his cellmate. During closing arguments, defense counsel urged the jury to disbelieve Shands based on his pattern of "snitching" against others in order to secure a better deal for himself.

Shands's credibility sustained vigorous attack on the bases of his drug use, motive to lie, and record of criminal convictions. The trial court did not abuse its discretion by ruling that the limited probative value from cross-examination about Shands's prior prison terms and voluntary 72-hour hold did not justify the "mini-trials" that would have likely arisen with the introduction of this evidence.

## III

### CALCRIM Nos. 318 and 335

Tuggles argues that, when read together, CALCRIM Nos. 318 and 335 erroneously instructed the jury that an accomplice's testimony at trial could be corroborated by the same accomplice's prior out-of-court statements.[8] The Attorney General counters that the claim is noncognizable on appeal for failure to request a modification of the instructions in the trial court. We conclude that the issue has been forfeited, and that Tuggles's argument has no merit in any event.

As given by the trial court, CALCRIM No. 335 instructed: "If the crime of murder or lesser charges were committed, then Eugene Shands was an accomplice to that crime. [¶] You may not convict a defendant of murder based on the statement or testimony of an accomplice alone. You may use the statement or testimony of an accomplice to convict a defendant only if: [¶] 1. The accomplice's statement or testimony is supported by other evidence

---

[7] Shands testified that he recognized the "Mini 14" firearm shown by Mitchell early on the night of the murder because it was the same model used by guards in prison. Mitchell returned the weapon to its case and put it back into his truck shortly after showing it off to the others. There was never any talk about using Mitchell's firearm that evening.

[8] Mollett has not joined in this argument.

that you believe; [¶] 2. That supporting evidence is independent of the accomplice's statement or testimony; [¶] AND [¶] 3. That supporting evidence tends to connect the defendant to the commission of the crime. [¶] Supporting evidence, however, may be slight. It does not need to be enough, by itself, to prove that the defendant is guilty of the charged crime, and it does not need to support every fact about which the witness testified. On the other hand, it is not enough if the supporting evidence merely shows that a crime was committed or the circumstances of its commission. The supporting evidence must tend to connect the defendant to the commission of the crime. [¶] The evidence needed to support the statement or testimony of one accomplice cannot be provided by the statement or testimony of another accomplice. [¶] Any statement or testimony of an accomplice that tends to incriminate a defendant should be viewed with caution. You may not, however, arbitrarily disregard it. You should give the statement or testimony the weight you think it deserves after examining it with care and caution and in the light of all of the other evidence."

The court also instructed the jury with CALCRIM No. 318 as follows: "You have heard evidence of statements that a witness made before the trial. [¶] If you decide that the witness made those statements, you may use those statements in two ways: 1. to evaluate whether the witness's testimony in court is believable, AND 2. As evidence that the information in those earlier statements is true."

Tuggles did not object to CALCRIM Nos. 318 and 335 in the trial court, nor did he request modification or amplification of the instructions given. Nonetheless, Tuggles urges us to review the claim based on the trial court's duty to instruct the jury sua sponte on all relevant and necessary law. The Attorney General counters that defendant forfeited the contention by failing to request a modification of the instructions given. We agree that the issue was forfeited.

■ It is well settled that "a defendant need not object to preserve a challenge to an instruction that incorrectly states the law and affects his or her substantial rights." (*People v. Palmer* (2005) 133 Cal.App.4th 1141, 1156 [35 Cal.Rptr.3d 373]; see also § 1259.) Even so, " ' " 'a party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general *or incomplete* unless the party has requested an appropriate clarifying or amplifying language.' " ' " (*People v. Spurlock* (2003) 114 Cal.App.4th 1122, 1130 [8 Cal.Rptr.3d 372], italics added, quoting *People v. Hill* (1992) 3 Cal.4th 959, 997 [13 Cal.Rptr.2d 475, 839 P.2d 984].)

The gravamen of Tuggles's argument is a claim of improper "completion of the instruction by the trial court." To preserve the issue, Tuggles was

required to request the additional language needed to complete the jury instructions. (*People v. Spurlock, supra*, 114 Cal.App.4th at p. 1130.) The lack of such a request by Tuggles forfeited the issue for review. (*Ibid.*)

Anticipating forfeiture, Tuggles argues that his trial counsel rendered ineffective assistance for failing to request appropriate instructions. Determining whether defense counsel was constitutionally deficient requires that we ascertain whether the instructions given by the trial court incompletely stated the law regarding corroboration of accomplice testimony.

Tuggles argues that the language of CALCRIM No. 335 "strongly implies that the statement *and* testimony of an accomplice together are sufficient to convict the defendant." He reasons that the jury could have relied on Shands's prior out-of-court statements to the police to corroborate Shands's testimony at trial. Tuggles claims that this bootstrapping approach to Shands's self-corroboration was further invited by CALCRIM No. 318's instruction that the jury could consider whether an out-of-court statement indicated the veracity of subsequent testimony. We reject Tuggles's tortured reading of CALCRIM Nos. 318 and 335.

In addressing the issue, we follow the rule that challenged instructions " 'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record. [Citation.] In addition, in reviewing an ambiguous instruction such as the one at issue here, we inquire 'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution. [Citation.]" (*Estelle v. McGuire* (1991) 502 U.S. 62, 72–73 [116 L.Ed.2d 385, 112 S.Ct. 475].)

No reasonable jury would have understood CALCRIM Nos. 318 and 335 to allow Shands to corroborate his own testimony. CALCRIM No. 318 informed the jury that it could consider discrepancies between out-of-court statements and in-court testimony to decide that a witness's statements on the stand were not trustworthy. CALCRIM No. 335 served a similar function in cautioning the jury against blithe acceptance of testimony by an accomplice. CALCRIM No. 335 instructed the jury to require supporting testimony that was independent of the accomplice's statement or testimony. The instruction's use of the word "independent" to describe the sort of evidence that could serve as corroboration eviscerates Tuggles's claim that the instruction allowed Shands to corroborate his own testimony.

Even if CALCRIM Nos. 318 and 335 were susceptible of the interpretation advanced by Tuggles, any mistaken impression was dispelled by the court's giving of CALCRIM No. 301. As given, CALCRIM No. 301 stated: *"Except*

*for the testimony of Eugene Shands* and Joshua D. Tuggles, *which requires supporting evidence*, the testimony of only one witness can prove any fact. Before you conclude that the testimony of one witness *proves* a fact, you should carefully review all the evidence. [¶] Testimony from the defendant Tuggles must be corroborated only when it is being offered by the People to incriminate another defendant." (Italics added.) This instruction informed the jury that Shands's status as an accomplice disallowed his testimony to suffice for conviction without additional evidence in support.

Consistent with CALCRIM No. 301, Tuggles's counsel argued to the jury that Shands "is an accomplice, we know that. Now, you were read [CALCRIM No.] 3.01 [*sic*] . . . . [¶] . . . [I]t says that before you can convict anybody in this case with an accomplice testimony, you cannot do it solely on [Shands's] testimony. [¶] [Shands] must be supported by other evidence you believe, *and the evidence must be independent of Shands.*" (Italics added.) With this argument, the jury again heard that corroborating evidence was needed that did not also come from Shands.

Similarly, the prosecutor argued, "[Defendant] Shands has to be corroborated. [¶] But the law is very clear that this evidence only needs to be slight. Doesn't have to be every fact. It's about connecting the defendant to the commission of the crime. [¶] . . . I'd say 95 or more percent of what [defendant] Tuggles said Shands said." The prosecution further stated, "But [defendant] Tuggles corroborates him. All of the witnesses corroborate what [defendant] Shands has said about the major portions of this case."

CALCRIM Nos. 318 and 335 did not inform the jury that it could use Shands's out-of-court statements to corroborate his later testimony at trial. With the additional consideration of CALCRIM No. 301, we find that no reasonable jury could have understood the instructions to allow an accomplice to corroborate himself. (*People v. Harrison* (2005) 35 Cal.4th 208, 252 [25 Cal.Rptr.3d 224, 106 P.3d 895]; *People v. Burgener* (1986) 41 Cal.3d 505, 538 [224 Cal.Rptr. 112, 714 P.2d 1251].) The arguments of counsel paralleled the correct statement of law provided by the jury instructions. Accordingly, we find no error in the challenged instructions that required the defense to remedy by requesting modification or amplification in order to provide effective assistance of counsel.

## IV

### Failure to Instruct on Flight

Defendants argue that the trial court erred in failing to instruct the jury on flight. Tuggles contends the jury could have inferred a consciousness of guilt

from his staying with his grandmother the day after the shooting. Mollett asserts that Shands's testimony about immediately leaving after the shooting allowed the jury to find the hasty departure indicated consciousness of guilt. We shall reject defendants' argument.

Section 1127c addresses the trial court's obligation to instruct the jury on flight as follows: "In any criminal trial or proceeding where *evidence of flight of a defendant is relied upon as tending to show guilt*, the court shall instruct the jury substantially as follows: [¶] The flight of a person immediately after the commission of a crime, or after he is accused of a crime that has been committed, is not sufficient in itself to establish his guilt, but is a fact which, if proved, the jury may consider in deciding his guilt or innocence. The weight to which such circumstance is entitled is a matter for the jury to determine." (Italics added.)

As the Attorney General points out, the prosecution did not argue that defendants' departure from Charbono Way after the shooting or Tuggles's stay at his grandmother's house indicated consciousness of guilt. Tuggles replies that there was *evidence* of flight from the murder scene that was elicited by the prosecution.

 Section 1127c does not require a flight instruction upon introduction of evidence that might be construed as flight. Instead, a jury must be instructed on flight only if the prosecution relies on such evidence to prove guilt. Here, the prosecution did not argue that Tuggles or Mollett demonstrated consciousness of guilt by leaving Charbono Way after Romero was shot. For this reason, an instruction on flight was not required. (*People v. Sheldon* (1967) 254 Cal.App.2d 174, 180–181 [61 Cal.Rptr. 778].)

## V

### Denial of Motion for New Trial Based on Juror Misconduct

Defendants argue that the trial court abused its discretion in denying their joint motion for a new trial based on misconduct by Juror No. 7. Defendants allege as misconduct Juror No. 7's failure to disclose her past use of methamphetamine, her relationship to a man accused of rape, a hit-and-run accident that killed her friend, and her discussions about the case outside the jury room. We shall conclude that the trial court properly denied defendants' motion for new trial.

### A

After the verdict, Mollett filed a motion for new trial based on a declaration by Juror No. 5. Tuggles orally joined the motion.

## Juror No. 5

At the motion for new trial, Juror No. 5 testified that, in her presence as well as that of Juror No. 9 and Alternate Juror No. 4, Juror No. 7 stated, "I am glad I was put on this jury because I was in a similar situation earlier in my life." Juror No. 5 asked what she meant, and Juror No. 7 stated that a close friend had been murdered. Juror No. 7 went on to state that "if they would have known everything about me, they would have never picked me." Juror No. 5 told Juror No. 7 that they were supposed to avoid discussing the case. Juror No. 5 did not report Juror No. 7's remarks to the court or court personnel.

Juror No. 5 first mentioned the conversation when she contacted Tuggles's counsel the day before sentencing. Juror No. 5 explained that she was motivated to contact Tuggles's counsel because she believed the jury reached the wrong decision. She stated that she had been pressured into voting for Tuggles's guilt.

Juror No. 5 asserted that several factors had pressured her into a verdict with which she did not agree. A male juror slammed his hands on a table several times while looking at her. Her desire to review the videotapes introduced as exhibits was rebuffed by the other jurors. Other jurors rolled their eyes when Juror No. 5 stated that methamphetamine can "fry your brain." Juror No. 5 wanted to vote by secret ballot, but the other jurors compelled a voice vote.

For a while, Juror No. 5 held out against voting on Tuggles's guilt by seeking more discussion. One juror told her that it would be a hung jury because of her. Others told her that she needed to make a decision. When the other jurors did not like her decision, they said, "[O]kay, let's talk about it some more. We have to be able to talk about that, that's what we are in here for." The jurors continued the discussion as to Tuggles's guilt, and Juror No. 5 "did not agree with what was said . . . ."

The jury deliberated for a week and a half. In the end, Juror No. 5 voted to convict Mollett and Tuggles. When polled by the court, she stated that it was her true and correct verdict.

With respect to Juror No. 5, the trial court made the following findings in ruling on the motion for new trial: "At some point we talked about [Juror No. 5] being ostracized, and it kind of comes into play, I think, with this whole question here. [¶] And I am now specifically addressing this issue of the late report—I am sorry, of the allegation that [Juror No. 7] said that she had a friend who was murdered, and that's why she wanted to be on the jury.

[¶] I am going to take into consideration [Juror No. 5] brought this to the attention of [Tuggles's counsel] because she was unhappy with the verdict. [¶] This is not a situation where somebody says, you know, I am happy with the verdict, but I have got to tell you, there was some misconduct in there. [¶] So the thing that she is alleging actually is in service of her motive, and that is that she wanted, at least, [Tuggles's counsel] or not [*sic*] the court to know that she did not feel her—that she had an abiding conviction, if you will, of her vote. [T]hat makes me question her credibility. [¶] In addition to that, she failed to report this at the time it happened, not only to her, but to believe her, there were two other people who heard something from [Juror No. 7] that was quite dramatic, I think any lay person would indicate [was] misconduct. [¶] [Juror No. 5] herself said that in response to that, she and the other jurors there counseled [Juror No. 7] that was not proper. [¶] Now to believe that that happened and neither [Juror No. 5] nor the other two jurors brought it to the attention of any court personnel, or the court, or I assume—it stretches belief. [¶] I am taking into consideration that the verdicts by [Juror No. 5] and the others were mixed, that there were two [defendants] who were acquitted, and two defendants who were found guilty, which is some evidence as far as the court's concerned, that whatever dynamics were present in the jury room, they resulted in a verdict that at least nominally discerns between the defendants. [¶] And I think discerns among the defendants in a rational way. I specifically am going to find that [Juror No. 5] is not credible in her testimony."

The trial court also rejected defendants' argument that Juror No. 5 was pressured into voting for a verdict with which she did not agree. The court explained, "[W]hat I heard was a spirited discussion in which any one of us would expect from jurors who have heard evidence and who appreciate the gravity of the situation before them, and who are actively and even dramatically expressing their opinions, and attempting to elicit the opinions of their fellow jurors."

## Juror No. 9

Juror No. 9 often took smoking breaks with Juror No. 7 and Alternate Juror No. 4. During a break in deliberations, Juror No. 7 told Juror No. 9 that she had used methamphetamine in the past. She also asked Juror No. 9 whether to bring up an incident in which she was asked by the police about whether she knew anything about a rape in San Francisco. Juror No. 9 told Juror No. 7 that she should mention it to the whole jury. Juror No. 7 had not previously brought it up because the voir dire question about relationships with people involved in crimes had inquired only about close friends. The person that Juror No. 7 was asked about in connection with the rape investigation had not been a close friend.

Juror No. 7 also told Juror No. 9 she intended to share her knowledge about terms like "punking" during deliberations because "she wanted to give the jury clarification about terminology . . . that older people may think is different than what young people think . . . ." (Juror No. 7 was the youngest person on the jury.) Juror No. 9 encouraged her to share the information with the entire jury.

Juror No. 9 never heard Juror No. 7 say anything about a friend being murdered or deliberately withholding information during voir dire. Juror No. 9 stated that she probably would have reported to the court any statements by Juror No. 7 about deliberately withholding information during voir dire.

## Juror No. 7

Juror No. 7 testified that she truthfully and fully answered the voir dire questions. Juror No. 7 denied having any secret motive to serve on the jury. She never told Juror No. 5 that she was glad to serve on a jury because of a similar situation in which her friend was murdered. Although Juror No. 7 had a friend who had been killed in a hit-and-run accident, she did not consider that incident to have been murder. Juror No. 7 also did not consider herself to have been the victim of a crime.

When asked about her acquaintance with a man charged with rape, Juror No. 7 explained that she had been homeless in San Francisco when he allowed her to stay at his house. He would bring random people home to have sex with them in the room next to that in which Juror No. 7 slept. One morning, she woke to a police officer asking whether she "knew anything." She said that she did not, and went to work. Later that day, Juror No. 7 packed up her belongings and moved back to Sacramento. She did not know the outcome of the investigation.

Based on the incident in San Francisco, Juror No. 7 told the other jurors during deliberations that "people don't have any idea what can go on under their nose[s] . . . ." None of the other jurors asked why she made that statement, and Juror No. 7 did not elaborate.

Juror No. 7 admitted that she had used methamphetamine in the past. Thus, she knew how the drug had affected her. However, Juror No. 7 did not like to disclose her past drug use if unnecessary. During voir dire, prospective jurors were asked whether they could impartially consider the testimony of witnesses with lifestyles that involved drugs and alcohol. Juror No. 7 believed that she could fairly consider such testimony. She believed that she did not need to disclose her past methamphetamine use because the prosecutor asked

only whether drugs or alcohol were "a hot button issue" for any of the jurors. Drug usage was not a "hot topic" for her. No voir dire questions specifically addressed methamphetamine usage, so Juror No. 7 decided not to bring it up.

Juror No. 7 revealed her past methamphetamine use to Juror No. 9 and Alternate Juror No. 4 during a discussion about Alternate Juror No. 4's job. The discussion did not relate to the trial. During deliberations Juror No. 7 told the other jurors that methamphetamine "effects [*sic*] everybody differently, and just to go off of generalizations about what it does to someone is not necessarily appropriate in this point in time."

Also during deliberations, Juror No. 7 responded to Juror No. 4's ideas about what "punked" meant. She explained a few slang terms to the older jurors. None of the slang terms related to drugs.

### B

Defendants contend Juror No. 7 was not truthful in her answers on voir dire.

 As the California Supreme Court recently explained, "A criminal defendant has a constitutional right to an impartial jury, and the pretrial voir dire process is important because it enables the trial court and the parties to determine whether a prospective juror is unbiased and both can and will follow the law. But the voir dire process works only if jurors answer questions truthfully." (*People v. Wilson* (2008) 44 Cal.4th 758, 822 [80 Cal.Rptr.3d 211, 187 P.3d 1041].)

Not every failure to disclose background information in response to voir dire questioning constitutes misconduct by jurors. " 'Although intentional concealment of material information by a potential juror may constitute implied bias justifying his or her disqualification or removal [citations], mere inadvertent or unintentional failures to disclose are not accorded the same effect. "[T]he proper test to be applied to unintentional 'concealment' is whether the juror is sufficiently biased to constitute good cause for the court to find under . . . sections 1089 and [former] 1123 that he is unable to perform his duty." ' " (*People v. Wilson, supra*, 44 Cal.4th at p. 823, quoting *People v. McPeters* (1992) 2 Cal.4th 1148, 1175 [9 Cal.Rptr.2d 834, 832 P.2d 146].)

In evaluating claims of intentional concealment by jurors during voir dire, "[w]e accept the trial court's credibility determinations and findings on questions of historical fact if supported by substantial evidence." (*People v. Nesler* (1997) 16 Cal.4th 561, 582 [66 Cal.Rptr.2d 454, 941 P.2d 87]; see

*People v. Majors* (1998) 18 Cal.4th 385, 417 [75 Cal.Rptr.2d 684, 956 P.2d 1137].) With these principles in mind, we consider defendants' claims of misconduct by Juror No. 7.

## C

Mollett contends that Juror No. 7 committed misconduct by deliberately concealing her past drug usage and involvement in the rape investigation. Tuggles additionally argues that Juror No. 7 committed misconduct by failing to disclose the hit-and-run accident that killed her friend.

In ruling on defendants' motion for new trial, the court found that Juror No. 7 did not intentionally conceal any material information during voir dire questioning. The trial court explained: "One [issue] has to do with whether [Juror No. 7] withheld material information in the course of voir dire, and I am going to find that she did not. [¶] The question never was asked about whether she used drugs or not. Question [*sic*] had to do with whether a juror could evaluate the credibility of witnesses who had lifestyles other than hers, and certainly did include different lifestyles which could involve the use of drugs. [¶] And she answered at that time as I would expect she would have answered today, and that is it would not make a difference if she—given she did have experience with drugs, it does not appear that her answer would have been any different in the course of voir dire. [¶] So I am going to find expressly she did not withhold information. And also in addressing [Mollett's] specific proposition that she does not have any burden to attempt to discern what the attorneys are asking for, and to give that information, it does not appear to me there was any guile or withholding of information in regard to the drugs whatsoever."

Substantial evidence supported the trial court's ruling. Rather than being asked about their own experiences with illicit drugs such as methamphetamine, voir dire questioning of the prospective jurors concerned their ability to keep an open mind when evaluating testimony by witnesses whose lifestyles involved drugs and alcohol. Specifically, the question posed by the prosecutor to the jury venire was: "Some of the witnesses, we've mentioned, have different lifestyles. Some of them you'll find out they may have been drinking that night. They may have taken some drugs, and you have to scrutinize them and say even though they took that substance, do they make sense? . . . [¶] [I]s there any of you that drugs or alcohol is such a hot button that you cannot trust somebody if you found they are drinking?" The record does not indicate an affirmative response from any juror to these questions. Juror No. 7 did not conceal her past use of methamphetamines. She was never asked about it.

Juror No. 7 also did not conceal her knowledge about the rape investigation in San Francisco. During voir dire, the trial court asked the jury panel: "Now, [has] anybody [or *a*] *close* friend been accused or arrested for any offense, including traffic or driving under the influence? [¶] You or [*a*] *close—someone close to you* arrested for any offense, including traffic or driving under the influence or alcohol?" (Italics added.) Juror No. 7 answered that she had two cousins and an uncle who had been convicted of driving under the influence. She also stated that she had a cousin who had several times been arrested for possession of drugs.

Juror No. 7 did not disclose her experience in San Francisco because she barely knew the man being investigated for rape. She had only stayed on his couch for four nights, and did not know the outcome of the investigation. Because the man who was investigated was not a close friend, Juror No. 7 did not engage in concealment by failing to mention the incident. Even if she had, her lack of disclosure would not warrant reversal. (*People v. Duran* (1996) 50 Cal.App.4th 103, 114–115 [57 Cal.Rptr.2d 635] [no misconduct absent showing juror had "close relationship" with individual whom the juror failed to identify in response to voir dire questioning].)

During voir dire, Juror No. 7 did not disclose that her friend had been killed in a hit-and-run accident. Persons trained in law may immediately recognize the criminal nature of a driver's departure. (See § 192, subd. (c) [vehicular manslaughter]; Veh. Code, § 20001, subd. (b)(2) [hit-and-run accident resulting in death punishable as a felony].) However, the record suggests that Juror No. 7 considered the death to have been accidental rather than part of a crime. At the hearing on the motion for new trial, Juror No. 7 answered questions about the incident as follows:

"Q [by the prosecutor] Have you ever had a friend that was murdered?

"A [by Juror No. 7] No. I mean, I had a friend who was killed in a hit and run accident, but I don't know if that could be qualified as murder so—

"Q How long ago was that?

"A Freshman year of high school, so 1998.

"Q Do you know anything about whether that was a murder, whether it was an accident?

"A No. She just died. That's all I remember."

Juror No. 7's answers did not focus on the criminality of the accident, and any failure to disclose it in response to voir dire questions about crimes

appears to have been inadvertent. Juror No. 7 testified that she did not consider herself or anyone close to her to have been the victim of a crime. Juror No. 7's failure to disclose the accident did not constitute misconduct. (*People v. Wilson, supra,* 44 Cal.4th at p. 823.)

## D

Tuggles urges us to conclude that Juror No. 7 committed misconduct by discussing the case during smoking breaks while trial was still pending. He asserts that Juror No. 7 undermined the fairness of trial by talking about her drug use as it related to defense arguments about the lack of credibility of prosecution witnesses, the rape investigation in San Francisco, and slang terms used by the witnesses. We shall reject his argument.

Juror No. 7 testified that she brought up her past drug use during a break only in reference to Alternate Juror No. 4's comments about her job. The discussion did not relate to the trial.

As we have already explained, Juror No. 7's involvement in the rape investigation in San Francisco was minimal. She was not close to the man being investigated, and her involvement encompassed no more than being asked by the police whether she "knew anything." The record indicates that Juror No. 7 did ask Juror No. 9 whether she should mention the matter to the whole jury. However, the discussion during the break did not involve her connecting the experience with the ongoing trial.

Juror No. 7's mention of her familiarity with slang terminology during a break came up in the form of asking Juror No. 9 whether she should bring it up during deliberations. As with the rape incident, Juror No. 9 answered that Juror No. 7 should mention it during deliberations. Jurors Nos. 7 and 9 did not use the issue of slang terminology to discuss the trial while it was still pending.

## E

Mollett argues that Juror No. 7 committed misconduct by mentioning her experience with drugs during jury deliberations. Mollett contends that Juror No. 7 "could tell, and did tell, her fellow jurors that based on her past experience with narcotics that Shands, Zamarron, and the other prosecution witnesses who used narcotics and drugs, were not necessarily adversely impacted by such abuses. Instead, they may be very competent and reliable witnesses." In so arguing, Mollett overstates the evidence in the record, which shows that Juror No. 7 stated only that drugs affect people differently. Her comment did not favor the prosecution's witnesses but instead called for

individualized evaluation of their testimony. We discern no prejudice to defendants arising out of the challenged statement by Juror No. 7.

We agree with the Attorney General about the instructive value of the California Supreme Court's decision in *In re Lucas* (2004) 33 Cal.4th 682 [16 Cal.Rptr.3d 331, 94 P.3d 477] (*Lucas*). In *Lucas*, the defendant alleged misconduct arising out of Juror K.'s comments during deliberations based on his experience with heroin, marijuana, cocaine, LSD, and amphetamines. (*Id.* at p. 694.) Juror K. told the other jurors that the defense, which relied on the effects of alcohol and drug ingestion, was not credible. (*Id.* at p. 694.) Juror K. stated, " 'Well, I'm not trying to tell you anything, but I do have some experience in using drugs, and I've seen a lot of people use drugs, and I've never seen them do what this man has done,' that is, 'slaughtering his next door neighbors.' On the other hand, he told one juror, 'if I wouldn't have quit doing what I was doing [referring to his own drug abuse], it possibly could have been me sitting up there,' even though, as the juror stated, he was not by nature a violent man." (*Ibid.*)

The *Lucas* court rejected the defendant's argument that Juror K.'s comments constituted misconduct by injecting "extraneous evidence of Juror K.'s experience with controlled substances" into the jury's deliberations. (*Lucas, supra*, 33 Cal.4th at p. 695.) The Supreme Court explained that "Juror K. did not hold himself out as an expert in a technical matter on the basis of his education or occupation, but merely related his own experience. Under the circumstances, Juror K.'s apparently brief comments merely reflected his own experience as it related to the evidence received at the trial and the inferences that petitioner sought to have the jurors draw from that evidence. His experience, although not shared by the majority of persons, is fairly common. . . . [¶] Even if Juror K.'s comments are viewed as constituting misconduct, there is no substantial likelihood that he or any other juror was biased. His comments were not inherently and substantially likely to exercise an improper influence on the jury, nor were they indicative of actual bias on his part. Taking into account the general awareness of persons in our society of the effect of various controlled substances, the mild and brief nature of the remarks, the tentative spirit in which they clearly were offered, and the lack of insistence by Juror K. that his experience should convince other jurors to discredit petitioner's defense, we conclude it is not substantially likely that any juror actually was biased by the comments of Juror K." (*Lucas*, 33 Cal.4th at p. 697.)

Here, Juror No. 7's single comment that drugs affect everyone differently was more brief and tentative than the opinion expressed by Juror K. in *Lucas*. Although Juror No. 7 based her comment on her own experience with methamphetamine, she did not impermissibly introduce extraneous evidence

into the jury deliberations. (*Lucas, supra*, 33 Cal.4th at p. 697.) Rather than favoring the prosecution's witnesses, as Mollett contends, Juror No. 7's observation about the disparate effects of drugs on people simply called for individual consideration of the witnesses who testified to ingesting drugs or alcohol on the evening of the murder. Especially as a response to Juror No. 5's categorical statement that methamphetamines can "fry your brain," Juror No. 7's comment did nothing more than urge the jury to avoid stereotypes about drug usage. We agree with the trial court that Juror No. 7's statement about the effects of drugs were a legitimate part of a spirited discussion by the jury.

## VI

### Denial of Access to Jurors' Personal Contact Information

Prepared for our conclusion that the trial court did not err in denying the motion for new trial based on juror misconduct, defendants advance the alternate argument that the trial court impermissibly thwarted their attempts to fully investigate misconduct by denying them access to the jurors' personal contact information. Defendants contend the trial court erred in concluding that it had no discretion under Code of Civil Procedure section 206 to order the release of addresses and telephone numbers of jurors who objected to the disclosure.[9] Defendants further argue that the trial court violated their federal constitutional rights to due process and effective assistance of counsel by ruling that Code of Civil Procedure section 237 forbids the release of contact information for objecting jurors.

We conclude that the trial court correctly refused to disclose to the parties the personal contact information of the jurors. However, the trial court erred in concluding that it lacked discretion to order jurors to appear at a posttrial hearing. Nonetheless, on this record, the error was harmless beyond a reasonable doubt.

### A

On May 12, 2006, Tuggles's counsel filed a motion for access to jurors' addresses and telephone numbers. The motion was based on an interview with Juror No. 5, during which she stated that she had been pressured into reaching a verdict and had observed misconduct by Juror No. 7. The trial court found that defense counsel established good cause to request the contact information for the remaining jurors. The court stated that it would "notify all

---

[9] Jurors were identified by name during voir dire. Thus, counsel did not later need to seek disclosure of jurors' names in addition to their addresses and telephone numbers.

of the jurors and give them an opportunity to object to their personal information being released." Jurors who did not object, or who wished to object in person, were asked to appear at a hearing set for June 8, 2006.

The letter sent by the trial court included a preprinted declaration offering the options to appear in person or through counsel, appear by telephone, or not appear "but make [the juror's] feelings known through this declaration." Jurors who did not wish to appear had the choice of objecting or not objecting to the release of their addresses and telephone numbers to counsel for all parties. Ten jurors returned their declarations to elect not to appear and not to release their contact information. Juror No. 5 consented to being contacted by counsel.

On June 8, 2006, the trial court noted that it had received declarations from many of the jurors. Even so, the trial court decided to send a second letter in order to more fully apprise jurors of their options. The second letter again offered the options to appear in person or through counsel, appear by telephone, or not appear and make the juror's election known by written declaration. If electing not to appear, each juror had the option to (1) allow the release of his or her address and telephone number to counsel for all parties, (2) allow contact only at an address specified by the juror, (3) make himself or herself available to the parties at either the courthouse or one of the parties' offices at a reasonable time arranged by the court, (4) decline to speak with the attorneys and object to the release of any contact information, or (5) "Other," which invited the juror to "state fully any matter [he or she] wish[ed] the court to consider . . . ." Jurors who decided to appear had the option to "request that the court close to the public any hearing to determine whether this information shall be released."

Juror No. 7 and Alternate Juror No. 3 appeared at the June 8 hearing in response to the first letter. Juror No. 7 consented to the release of her contact information. Alternate Juror No. 3 decided to await the court's second letter before making a decision.

Ten jurors and alternates returned the second declaration to object to the release of their personal information. Jurors Nos. 5, 7, and 9 consented to being contacted.

On August 18, 2006, Mollett's counsel noted that Jurors Nos. 5 and 9 had already been interviewed. The trial court ruled that the request for these jurors' contact information was therefore moot. The court denied the motion to release the information of Jurors Nos. 1, 2, 3, 4, 8, 10, 11, and 12 in addition to Alternate Jurors Nos. 1, 4, and 6 because each of these jurors had objected. Alternate Jurors Nos. 3 and 5 failed to respond. The trial court

presumed that these jurors received the letter and were aware that a failure to respond would be construed as a waiver of the right to refuse access to their contact information. Alternate Juror No. 2 consented to allow defense counsel to interview him at a later date. The court noted that the letter to Juror No. 6, the foreman, had been returned as undeliverable. Finding that the defense had established good cause to contact Juror No. 6, the trial court released his address to counsel to ascertain whether he consented to further contact.

In response to the court's ruling, the following colloquy occurred:

"[Mollett's counsel]: Can I review the possibilities that the defense has? We can ask the court . . . to order one or more jurors to a hearing here in Department 19.

"THE COURT: No. My ruling is that when a juror, having been noticed of their option[s], informs the court that they decline to speak with counsel, that I am not going to subpoena those jurors into court to be interviewed in court. [¶] I am going to—they don't have to speak, and I am not going to make them come in here to court and say I don't care to speak."

In an e-mail to all counsel sent later that day, the trial court noted that defense counsel had the option of issuing subpoenas to jurors who were located by means independent of the court's file.

On September 15, 2006, the trial court further ruled: "I want to make sure for the record—and in fact, I sent an e-mail to counsel clarifying this point. If I left the impression after our last hearing that the result of our last hearing was the Court was simply going to deny counsel's access to juror information that was in the Court's file and that counsel was free to use independent means to attempt to contact those jurors, then upon further reflection, I need to correct that impression. [¶] The Court's ruling did deny defense request for access to that juror information. . . . California Code of Civil Procedure Section 206 mandates that a juror who has withheld consent to contact or who has declined to have contact with the defense may not be further contacted. [¶] Now, it was on that basis the jurors who indicated in our return letter that they did not want to have contact with counsel. It was on that basis that I denied the addresses. But as I attempted to make clear in the e-mail, I hope I can make clear at this hearing, this Court's order is that counsel shall not have contact with jurors who have expressed in any way that they do not consent to that contact."

On September 20, 2006, Mollett's counsel filed a motion for release of the jurors' personal contact information. At the hearing on the motion, counsel argued that the trial court had discretion to order the release of the jurors'

contact information despite the provisions of Code of Civil Procedure sections 206 and 237. Counsel further argued that sections 206 and 237 are unconstitutional insofar as they prevent the defense from making "a full and fair inquiry" into juror misconduct. The prosecutor opposed the release of the jurors' contact information. Mollett's counsel modified the request to ask only for contact information for Alternate Juror No. 4[10] and Juror No. 6.

The trial court noted that it had already released the address of Juror No. 6, and it denied access to Alternate Juror No. 4's contact information. The court explained, "I'm going to find that this Court is precluded by Code of Civil Procedure Section 237, specifically subsection D[,] from releasing juror identifying information, even if good cause is shown, if the juror is unwilling to be contacted by the Petitioner. [¶] There's some language in Section D regarding discretion of the Court, but I'm willing to find that that discretion applies to whether the Petitioner shows good cause, number one. It also applies to whether the record establishes the presence of the compelling interest against disclosure, number two. But the third preclusion here is, or the juror is unwilling to be contacted by the Petitioner. [¶] And, frankly, I'm going to find that that is not a matter or subject to discretion of the Court, that is interpretable at least in this case. The jurors have clearly expressed that they are unwilling to be contacted by the Petitioner.

"Now, the statute also requires that the Court set forth the reasons in making expressed findings to support the denying of that motion. And my expressed finding is that the statute precludes disclosure if the jurors are [un]willing to be contacted by the Petitioner. The Court does not have the discretion to determine whether or not the juror is unwilling in the face of an expression expressed articulated [*sic*] by the juror."

**B**

 Criminal defendants have a right to trial by an impartial jury. (U.S. Const., 6th Amend.) "[T]here exists a 'strong public interest in the ascertainment of the truth in judicial proceedings, including jury deliberations.' (*People* v. *Atkins* (1988) 203 Cal.App.3d 15, 27 [249 Cal.Rptr. 863].) . . . Lifting the veil of postverdict secrecy to expose juror misconduct serves an important public purpose. ' "[T]o hear such proof would have a tendency to diminish such practices and to purify the jury room, by rendering such

---

[10] At the hearing, Mollett's counsel actually referred to Alternate Juror No. 3. Tuggles asserts, and the Attorney General does not disagree, that counsel misspoke and meant to refer to Alternate Juror No. 4. The record supports the conclusion that the reference was to Alternate Juror No. 4, who took smoking breaks with Juror No. 7. Defense counsel sought to show that Juror No. 7 committed misconduct during one of the breaks by discussing the case, outside of deliberations, with Alternate Juror No. 4 and Juror No. 9.

improprieties capable and probable of exposure, and consequently deterring jurors from resorting to them." ' (*People* v. *Hutchinson* (1969) 71 Cal.2d 342, 350–351 [78 Cal.Rptr. 196, 455 P.2d 132], quoting *Wright* v. *Illinois & Miss. Tel. Co.* (1866) 20 Iowa 195, 211.)" (*People v. Rhodes* (1989) 212 Cal.App.3d 541, 549–550 [261 Cal.Rptr. 1] (*Rhodes*), superseded by statute on other grounds as noted in *People v. Wilson* (1996) 43 Cal.App.4th 839, 852 [50 Cal.Rptr.2d 883].)

 When a defendant makes a prima facie showing of juror misconduct, the trial court must conduct a hearing. Although a hearing is required, testimony by jurors may not be necessary. The California Supreme Court has explained that "when a criminal defendant moves for a new trial based on allegations of jury misconduct, the trial court has discretion to conduct an evidentiary hearing to determine the truth of the allegations. We stress, however, that the defendant is not entitled to such a hearing as a matter of right. Rather, such a hearing should be held only when the trial court, in its discretion, concludes that an evidentiary hearing is necessary to resolve material, disputed issues of fact." (*People v. Hedgecock* (1990) 51 Cal.3d 395, 415 [272 Cal.Rptr. 803, 795 P.2d 1260] (*Hedgecock*).)

 After a jury convicts a defendant, defense counsel will often wish to interview jurors (or have them interviewed by an investigator). "It is not uncommon at the conclusion of a criminal trial for the attorneys representing a convicted defendant to attempt to contact the jurors to discuss the case with them. This procedure is usually employed in an effort to learn of juror misconduct or other information that might provide the basis for a motion for a new trial." (Pipes & Gagen, Cal. Criminal Discovery (4th ed. 2008) § 9:30, p. 864.) While counsel may wish to inquire whether misconduct prejudiced their clients, jurors often want to keep their contact information confidential. "Discovery of juror names, addresses and telephone numbers is a sensitive issue which involves significant, competing public-policy interests." (*Rhodes, supra*, 212 Cal.App.3d at p. 548.)

Trial courts have broad discretion to manage these competing interests by allowing, limiting, or denying access to jurors' contact information. (*Townsel v. Superior Court* (1999) 20 Cal.4th 1084, 1091 [86 Cal.Rptr.2d 602, 979 P.2d 963] (*Townsel*); *Rhodes, supra*, 212 Cal.App.3d at p. 550.) The Legislature has supplemented the protection of jurors' personal information by enacting Code of Civil Procedure section 206.[11]

 Code of Civil Procedure section 206 codifies the prerogative of jurors to discuss the case after trial as well as their right not to talk with the

---

[11] In pertinent part, Code of Civil Procedure section 206 provides:

"(a) Prior to discharging the jury from the case, the judge in a criminal action shall inform the jurors that they have an absolute right to discuss or not to discuss the deliberation or

parties. Nothing in section 206 compels a reluctant juror to speak with any of the parties, their counsel, or investigators. "If any juror refuses to consent, that is the end of the matter." (*Townsel, supra,* 20 Cal.4th at p. 1097.)

As this court has previously noted, "counsel and investigators routinely interview jurors before they leave the courthouse." (*Rhodes, supra,* 212 Cal.App.3d at p. 553.) However, counsel may not always have the opportunity to discuss the case right away. When counsel speak with jurors more than 24 hours after conclusion of a criminal trial, subdivision (c) of Code of Civil Procedure section 206 requires the attorneys themselves to remind jurors about their absolute right not to discuss the case with them.

If counsel cannot locate the jurors with whom they wish to speak, they can avail themselves of provisions in Code of Civil Procedure section 237 for access to jurors' contact information. Section 237 sets forth the procedure by which any person may petition the trial court for access to jurors' contact information.[12]

---

verdict with anyone. The judge shall also inform the jurors of the provisions set forth in subdivisions (b), (d), and (e).

"(b) Following the discharge of the jury in a criminal case, the defendant, or his or her attorney or representative, or the prosecutor, or his or her representative, may discuss the jury deliberation or verdict with a member of the jury, provided that the juror consents to the discussion and that the discussion takes place at a reasonable time and place.

"(c) If a discussion of the jury deliberation or verdict with a member of the jury pursuant to subdivision (b) occurs at any time more than 24 hours after the verdict, prior to discussing the jury deliberation or verdict with a member of a jury pursuant to subdivision (b), the defendant or his or her attorney or representative, or the prosecutor or his or her representative, shall inform the juror of the identity of the case, the party in that case which the person represents, the subject of the interview, the absolute right of the juror to discuss or not discuss the deliberations or verdict in the case with the person, and the juror's right to review and have a copy of any declaration filed with the court.

"(d) Any unreasonable contact with a juror by the defendant, or his or her attorney or representative, or by the prosecutor, or his or her representative, without the juror's consent shall be immediately reported to the trial judge."

[12] In pertinent part, Code of Civil Procedure section 237 provides:

"[(a)](2) Upon the recording of a jury's verdict in a criminal jury proceeding, the court's record of personal juror identifying information of trial jurors . . . consisting of names, addresses, and telephone numbers, shall be sealed until further order of the court as provided by this section. [¶] . . . [¶]

"(b) Any person may petition the court for access to these records. The petition shall be supported by a declaration that includes facts sufficient to establish good cause for the release of the juror's personal identifying information. The court shall set the matter for hearing if the petition and supporting declaration establish a prima facie showing of good cause for the release of the personal juror identifying information, but shall not set the matter for hearing if there is a showing on the record of facts that establish a compelling interest against disclosure. A compelling interest includes, but is not limited to, protecting jurors from threats or danger of

■ Under Code of Civil Procedure section 237, a showing of good cause does not automatically entitle the petitioner to jurors' contact information. The trial court may deny the request for jurors' contact information if the court finds a compelling interest for nondisclosure. (*Townsel, supra,* 20 Cal.4th at pp. 1095–1096.) Compelling interests include jurors' safety and the need for finality if a long period of time has elapsed since trial. (Code Civ. Proc., § 237, subd. (b); *Townsel, supra,* 20 Cal.4th at p. 1097 [denial of jurors' contact information after passage of nearly a decade after conclusion of a criminal trial upheld because the "long period of repose will have heightened the jurors' sense of privacy regarding . . . trial"].)

If the trial court does set the matter for hearing on whether to disclose jurors' contact information pursuant to Code of Civil Procedure section 237, that section gives jurors 20 days to object before the hearing. (Code Civ. Proc., § 237, subd. (c).) Jurors can avoid appearing at the hearing by objecting via telephone or in writing. (*Ibid.*; see also *Jones v. Superior Court* (1994) 26 Cal.App.4th 1202, 1209 [31 Cal.Rptr.2d 890] [holding that objection by juror to disclosure of his or her contact information requires the trial court to refuse releasing the information to counsel even without a hearing].) Regardless of how a juror might object to the release of his or her information, an objection precludes disclosure to the person requesting the information. (*Jones, supra,* at p. 1209; Code Civ. Proc., § 206, subd. (a).) As the California Supreme Court has explained, "A criminal defendant has neither a guaranty of posttrial access to jurors nor a right to question them about their guilt or penalty verdict." (*People v. Cox* (1991) 53 Cal.3d 618, 698–699 [280 Cal.Rptr. 692, 809 P.2d 351], disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22 [87 Cal.Rptr.3d 209, 198 P.3d 11].)

Nothing in Code of Civil Procedure section 206 or 237 dilutes the trial court's inherent power to shield jurors from unwanted contact by parties or their counsel.[13] (*Townsel, supra,* 20 Cal.4th at p. 1096.)

---

physical harm. If the court does not set the matter for hearing, the court shall by minute order set forth the reasons and make express findings either of a lack of a prima facie showing of good cause or the presence of a compelling interest against disclosure.

"(c) If a hearing is set pursuant to subdivision (b), the petitioner shall provide notice of the petition and the time and place of the hearing at least 20 days prior to the date of the hearing to the parties in the criminal action. The court shall provide notice to each affected former juror by personal service or by first-class mail, addressed to the last known address of the former juror as shown in the records of the court. In a capital case, the petitioner shall also serve notice on the Attorney General. Any affected former juror may appear in person, in writing, by telephone, or by counsel to protest the granting of the petition. A former juror who wishes to appear at the hearing to oppose the unsealing of the personal juror identifying information may request the court to close the hearing in order to protect the former juror's anonymity."

[13] Code of Civil Procedure section 206 does make an exception for peace officers investigating criminal conduct by jurors. (Code Civ. Proc., § 206, subd. (f).) Such investigation, however, is neither directed by the parties nor aimed at overturning the verdict.

## C

Defendants claim that even if Code of Civil Procedure sections 206 and 237 support the trial court's denial of access to jurors' contact information, their federal constitutional rights compelled the release of the information to counsel. Defendants offer two cases in support of their due process argument: *Remmer v. United States* (1954) 347 U.S. 227 [98 L.Ed. 654, 74 S.Ct. 450] (*Remmer*) and *Smith v. Phillips* (1982) 455 U.S. 209 [71 L.Ed.2d 78, 102 S.Ct. 940] (*Smith*). Although both cases affirm the right of criminal defendants to a jury trial free from misconduct by jurors, neither case holds that *the parties or their attorneys* have a right to directly contact or subpoena jurors after trial.

 In *Remmer*, the United States Supreme Court held that a trial court must hold a hearing when a defendant shows good cause to believe that a juror was improperly influenced. (*Remmer, supra,* 347 U.S. at p. 230.) *Remmer* involved an unnamed person who approached a juror during trial "and remarked to him that he could profit by bringing in a verdict favorable to the [defendant]." (*Id.* at p. 228.) The juror brought the attempted bribe to the attention of the trial court, which in turn informed the prosecution but not the defense. (*Ibid.*) An investigation concluded that the remark had been made in jest. When defense counsel learned of the investigation after trial, the defense moved for a new trial. The trial court denied the motion without a hearing. (*Ibid.*)

The Supreme Court declared the ruling to be error, explaining: "The trial court should not decide and take final action *ex parte* on information such as was received in this case, but should determine the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial, in a hearing with all interested parties permitted to participate." (*Remmer, supra,* 347 U.S. at pp. 229–230.) *Remmer* thus holds that jurors are allowed to testify. (See *Hedgecock, supra,* 51 Cal.3d at p. 416 [examining *Remmer*].) *Remmer* does not stand for the proposition that a party has the right to personally interview jurors or to subpoena them upon a belief that misconduct occurred.

 In *Smith*, the high court reiterated the rule that "the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias." (*Smith, supra,* 455 U.S. at p. 215.) *Smith* involved a juror who submitted an application for employment with the district attorney's office during a criminal trial being prosecuted by the same office. (*Id.* at p. 212.) When the assistant district attorney in charge of the hiring process learned of the job application, he brought it to the attention of his supervisor and the two attorneys prosecuting the case on which the juror was seated. (*Ibid.*) The two prosecutors took steps to avoid learning the

contents of the juror's application and to have no contact with him during trial. (*Id.* at p. 213.) However, the prosecutors did not inform the trial court or defense counsel about the juror's job application until after the defendant was convicted. Defense counsel then moved to set aside the verdict on the basis of juror misconduct. (*Ibid.*) The trial court denied the motion, and the court of appeals reversed based on the conclusion that any other holding would encourage prosecutors to wrongfully withhold information about possible juror misconduct. (*Id.* at pp. 213–214.) The Supreme Court reversed the decision of the court of appeals, explaining that due process safeguards the fairness of trials rather than focusing on whether counsel may have engaged in unethical conduct. (*Id.* at pp. 220–221.)

*Smith* does not indicate that the defense sought to interview or call as a witness the juror who submitted the job application. (See *Smith, supra,* 455 U.S. at pp. 213–214.) Thus, the case does not hold that due process requires jurors to be subject to subpoena by counsel. Instead, *Smith* holds only that a defendant has a right to a hearing on the issue of juror misconduct. (*Id.* at pp. 220–221; accord, *Remmer, supra,* 347 U.S. at pp. 229–230.)

Defendants also advance the argument that their federal constitutional right to effective assistance of counsel requires that counsel necessarily have access to jurors' contact information. To this end, Tuggles cites *Prince v. Superior Court* (1992) 8 Cal.App.4th 1176 [10 Cal.Rptr.2d 855] (*Prince*) and *Sanders v. Ratelle* (9th Cir. 1994) 21 F.3d 1446 (*Ratelle*). These cases are inapposite.

In *Prince,* the trial court ordered the defense to share the results of DNA testing with the prosecution. The Court of Appeal held that the order violated the defendant's right to effective assistance of counsel because it interfered with counsel's ability to communicate confidentially with experts in order to prepare a defense. (*Prince, supra,* 8 Cal.App.4th at p. 1180.) The case cannot be authority on any issue involving jurors because the decision resolved the defendant's pretrial writ petition. (*Id.* at p. 1179.)

No issue of juror misconduct was presented in *Ratelle* either. In *Ratelle,* the Ninth Circuit held that defense counsel rendered ineffective assistance by not investigating a potential defense. (*Ratelle, supra,* 21 F.3d at p. 1457.) Defense counsel had inexplicably failed to interview a person who confessed to firing the fatal shot for which the defendant was on trial as the shooter. (*Id.* at p. 1456.) The Ninth Circuit reversed the conviction based on the lack of investigation of a potentially meritorious defense. (*Id.* at p. 1460.) No issue of juror misconduct was raised in *Ratelle.* (See *id.* at p. 1449.)

We are unaware of any case from the United States Supreme Court or the appellate courts of the State of California holding that any provision of the federal Constitution requires the disclosure of the personal contact information of a juror to parties, their counsel, their representatives, or members of the general public—even upon a showing of a strong possibility of juror misconduct.

## D

Tuggles contends that the trial court should have compelled jurors who objected to the release of their information to attend the hearing on the motion for new trial anyhow. He argues that "[i]f the court was unwilling to release the juror contact information of the objecting jurors, it should have held an evidentiary hearing with the jurors, which would have protected their privacy rights and at the same time allowed appellants the ability to obtain complete evidence to support their new trial motion."

Mollett follows up on Tuggles's contention by asserting, "It is difficult to accept a proposition that jurors, so long as they object are immune from being interviewed about what may be egregious misconduct. A good case could be made that jurors who have committed misconduct are more likely to refuse to consent than . . . those that have not committed misconduct."

■ We understand these concerns that the inability of parties to subpoena or otherwise directly contact jurors likely to have committed misconduct essentially safeguards any misconduct that occurred. However, our holding that the trial court had discretion to deny counsel's request for release of jurors' personal identifying information does not mean that the court is required to ignore strong indicia of jury misconduct. A defendant in a criminal case has a federal constitutional right to a jury free of serious misconduct. (*Smith, supra*, 455 U.S. at pp. 220–222.)

A verdict reached by prejudicial juror misconduct must not be permitted to stand. (§ 1181, subds. 2, 3, 4; Code Civ. Proc., § 657, subds. 1, 2.) The trial court's role as a gatekeeper of juror personal identifying information means that it may do more than deny contact with jurors. As the California Supreme Court has explained, trial courts have inherent power, even aside from Code of Civil Procedure sections 206 and 237, to manage inquiries into juror misconduct. "A trial court has inherent as well as statutory discretion to control the proceedings to ensure the efficacious administration of justice. (See, e.g., § 1044; Evid. Code, § 765; *People* v. *Melton* [(1988)] 44 Cal.3d [713,] 734 [244 Cal.Rptr. 867, 750 P.2d 741]; *Cooper* v. *Superior Court* (1961) 55 Cal.2d 291, 301–302 [10 Cal.Rptr. 842, 359 P.2d 274].)" (*People v. Cox, supra*, 53 Cal.3d at p. 700.) Thus, where the trial court is presented with a credible

prima facie showing that serious misconduct has occurred, the trial court may order jurors to appear at a hearing and to answer questions about whether misconduct occurred.

Code of Civil Procedure sections 206 and 237 regulate requests for juror identifying information made by parties, attorneys, investigators, and the general public. Subdivision (a) of Code of Civil Procedure section 206 requires the trial court to advise jurors of their right not to discuss the case with "anyone." However, as subdivision (a) also makes clear, the term "anyone" refers to persons other than the trial judge. To this end, subdivision (a) refers to subdivisions (b), (d), and (e) in requiring jurors to be informed that they are not required to have any unwanted discussions with "the defendant, or his or her attorney or representative, or the prosecutor, or his or her representative," that any "unreasonable contact with a juror" by these specified persons be "immediately reported to the trial judge," and that disclosure of juror identifying information by any "court employee" constitutes a misdemeanor.

In *Townsel*, the California Supreme Court held that "[i]f a juror refuses to consent and so informs the trial court, certainly *counsel* has no legitimate claim under [Code of Civil Procedure] section 206 that her ability to investigate potential claims for [postconviction relief] was undermined unfairly." (*Townsel, supra,* 20 Cal.4th at p. 1096, italics added.) Under Code of Civil Procedure section 206, it is the trial judge who acts as the gatekeeper of jurors' personal information to prevent unwanted intrusion by the parties, counsel, and their representatives. However, the statute imposes no constraint on *the trial court* to investigate misconduct.

Code of Civil Procedure section 237 imposes restrictions on the release of juror identifying information to members of the public who seek direct access to jurors. Although subdivision (b) of section 237 allows "[a]ny person" to "petition the court for access" to jurors' personal information, the court must first conduct a hearing before granting such access. "If a hearing is set pursuant to" such request by a member of the public, the court must allow jurors 20 days' notice under subdivision (c) of Code of Civil Procedure section 237. Subdivision (c) allows jurors "to protest the granting of the petition" within the 20 days prior to the hearing. Section 237, however, does not grant jurors the right to protest the trial court's own setting of a hearing to investigate whether misconduct occurred.

In sum, Code of Civil Procedure sections 206 and 237 allow jurors to prevent the release of information to parties, their attorneys, investigators working for counsel, and members of the general public. The court must heed the wishes of reluctant jurors to bar disclosure of their personal identifying

information to these persons. However, Code of Civil Procedure sections 206 and 237 do not infringe upon the trial courts' inherent power to investigate strong indicia of juror misconduct. (See *People v. Cox, supra*, 53 Cal.3d at p. 700, and cases cited therein.) Jurors may not thwart an investigation of misconduct by the court itself. The trial court has discretion to subpoena even reluctant jurors when necessary to determine whether the factfinding process went awry. (See *ibid.*) ■ Accordingly, the trial court in this case erred by concluding that it had no power to order jurors to attend an evidentiary hearing after they declined to discuss the case *with counsel*. The duty to protect jurors from overzealous attorneys and investigators does not require an abdication of the court's obligation to ensure that the jury trial process is free from misconduct.

## E

The trial court's misunderstanding of its discretion to subpoena reluctant jurors—even while it was allowed to shield them from direct contact by parties and attorneys—constituted error. When a trial court misunderstands the scope of its discretion, we must assess whether the error resulted in prejudice to the appellant. (See *People v. Price* (1991) 1 Cal.4th 324, 492 [3 Cal.Rptr.2d 106, 821 P.2d 610].)

Because criminal defendants have a federal constitutional right to a jury trial free from juror misconduct (*Smith, supra*, 455 U.S. at pp. 220–222), we must reverse unless we are able to declare the error to be harmless beyond a reasonable doubt. (*Smith, supra*, 455 U.S. at pp. 220–221; *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824].)

Defendants contend they demonstrated a strong possibility of juror misconduct prior to the trial court's refusal to allow their attorneys to contact jurors directly. To this end, Tuggles points out that the affidavit of Juror No. 5 indicated serious misconduct by Juror No. 7.

Because the trial court did not believe that it had discretion to subpoena jurors under any circumstances following their objection to release of their personal information, we shall assume for purposes of our analysis that defendants presented a credible prima facie showing that there had been "misconduct . . . of a serious nature." (*Hedgecock, supra*, 51 Cal.3d at p. 419.) Even with this assumption, we conclude the error was harmless beyond a reasonable doubt.

As we have recounted, at the hearing on their motion for new trial, defendants received a full evidentiary hearing regarding their allegations of misconduct based on Juror No. 5's affidavit. Juror No. 5 testified about

statements indicating misconduct by Juror No. 7. Juror No. 7 rebutted the assertions of misconduct at the same hearing. And, Juror No. 9 corroborated Juror No. 7's testimony.

Defendants have alleged no juror misconduct apart from that actually addressed at the hearing. Ultimately, the trial court found Juror No. 5 noncredible in her attempt to undermine the legitimacy of a verdict which she had come to regret. Moreover, the trial court found that Juror No. 7's testimony established that she had not undermined the voir dire process by concealing important information about herself. Instead, the court found that Juror No. 7 engaged in no misconduct.

Remand would be futile because the trial court has already determined that the basis for defendants' allegations of juror misconduct was noncredible. The trial court's conclusion that Juror No. 7 did not engage in misconduct was based on its consideration of all the testimony, and we will not require the court to engage in pointless repetition of the hearing on juror misconduct. Here, remand "would be a useless and futile act and would be of no benefit to appellant[s]." (*People v. Seldomridge* (1984) 154 Cal.App.3d 362, 365 [201 Cal.Rptr. 377].)

## VII

### Cumulative Error

Tuggles contends that the cumulative effect of the errors he claims arise from instructional error, wrongful admission of hearsay, denial of his motion for access to jurors' contact information, and his motion for new trial require reversal of his conviction.[14] Having rejected all but one of his claims of error, we discern no prejudice—singly or cumulatively—that warrants reversal. (*People v. Jablonski* (2006) 37 Cal.4th 774, 832 [38 Cal.Rptr.3d 98, 126 P.3d 938].)

## VIII, IX*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

[14] Mollett does not make a cumulative prejudice argument.

*See footnote, *ante*, page 339.

## DISPOSITION

As to defendant Joshua Daniel Tuggles, the judgment is affirmed.

As to defendant Tyrone Duwane Mollett, the probation report preparation fee of $702 and the appointed counsel fee of $2,440 are stricken. The trial court is directed to correct its minute order, to prepare an amended abstract of judgment reflecting this modification, and to forward a certified copy of the amended abstract to the Department of Corrections and Rehabilitation. In all other respects, the judgment as to Tyrone Duwane Mollett is affirmed.

Robie, J., and Butz, J., concurred.

A petition for a rehearing was denied November 23, 2009, and the opinion was modified to read as printed above. Appellants' petitions for review by the Supreme Court were denied February 10, 2010, S178506.